<hr/>

69 A.3d 536

**Richard Glenn CRISE**

v.

**MARYLAND GENERAL HOSPITAL, INC.**
d/b/a Maryland General Hospital.

No. 2562, Sept. Term, 2011.

Court of Special Appeals of Maryland.

June 27, 2013.

494

Michael A. Pulver (Thomas F. Yost, Jr., The Yost Legal Group, on the brief), Baltimore, MD, for Appellant.

Christopher R. Daily (J. Mark Coulson, Miles & Stockbridge, PC, on the brief), Baltimore, MD, for Appellee.

Panel: EYLER, DEBORAH S., WATTS and LAWRENCE F. RODOWSKY, (Retired, Specially Assigned), JJ.

EYLER, DEBORAH S., J.

Richard Crise, the appellant, was a patient in the Emergency Room ("ER") at Maryland General Hospital ("MGH"), the appellee, on December 31, 2008. He suffered from numerous mental illnesses and before that day had been admitted to MGH for psychiatric treatment at least four times. He was examined by a nurse and an ER doctor, given a sedative, and was awaiting a psychiatric evaluation. Before the evaluation took place, he walked through the ER to a back door, and left the hospital. Clad only in a hospital gown, he walked in the cold weather in the direction of his house. When he got to the Howard Street Bridge, he saw police cars and two police officers slowly approaching him. He jumped off the bridge, fracturing his pelvis, left wrist, right arm, and right leg.

In the Circuit Court for Baltimore City, Crise sued MGH for medical negligence, alleging that steps should have been taken to monitor him so he would not have left the ER.

The case went to trial, with the first day devoted to jury selection. The next morning, the court entered judgment in favor of MGH on its own initiative, under Rule 2–502, on the ground that MGH did not owe Crise a legal duty of care. Specifically, the court ruled that MGH had no legal authority to keep Crise in the hospital, and his malpractice claim depended upon MGH's having such authority. Crise filed a motion for reconsideration or a new trial, which was denied.

On appeal, Crise presents one question for review:

Did the lower court err in ruling that [MGH] owed [him], its patient, no duty of care unless it had the legal authority to detain him?

For the reasons that follow, we conclude that the ruling was in error. Accordingly, we shall reverse the judgment and remand the case to the circuit court for further proceedings.

### FACTS AND PROCEEDINGS [1]

Crise, now age 30, was diagnosed with bipolar disorder at age 17. In the intervening years, he also was diagnosed at various times with schizoaffective disorder, schizophrenia, and depression. He has been admitted voluntarily to numerous Maryland hospitals for psychiatric treatment. At the time pertinent to this case, he was living with his mother, Mary Joanell Crise ("Ms. Crise"), and his teenage sister, Mary Crise ("Mary"), at a house in the Remington neighborhood of Baltimore City.

Before the events giving rise to this litigation, Crise had been admitted to the psychiatric unit at MGH at least four times, most recently in June of 2008. On that occasion, Ms. Crise took Crise to the MGH ER because he had been "non-

---

1. As we shall explain, these facts are derived from exhibits attached to MGH's motion for summary judgment, Crise's opposition thereto, MGH's motion *in limine,* and Crise's opposition thereto.

compliant with treatment" and was "becoming increasingly psychotic." He had not been taking his medications or sleeping and was exhibiting "pressured speech."[2] He was admitted to MGH's psychiatric unit for eight days with diagnoses of "[s]chizoaffective disorder chronic in acute exacerbation" and severe hypertension. During that admission, MGH maintained a "physically safe and emotionally supportive milieu" for Crise; monitored him "close[ly] ... to prevent any harm to himself or others"; counseled him about environmental stressors; encouraged him to attend counseling and group therapy; and adjusted his medications. Crise was discharged when his psychosis was under control and his treating doctors at MGH determined that he could "adequately and safely be managed in the community ... and that he would be no danger to himself or to others." He was prescribed Seroquel and Depakote, both to be taken twice daily,[3] and two medications for hypertension.

The events giving rise to the instant litigation began around 2:30 p.m. on December 31, 2008, when Crise, then age 25, arrived at MGH's ER accompanied by Ms. Crise and Mary.[4]

---

**2.** "Pressured speech" or "Pressure of Speech" is one of the diagnostic criteria for a manic episode. *American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders,* 4th Edition ("DSM–V") at 357 (2000). It is speech that is rapid, loud and difficult to interrupt. *Id.* at 356.

**3.** Seroquel is a proprietary name for quetiapine fumarate, an atypical antipsychotic drug used for the treatment of schizophrenia and bipolar disorder. *American Society of Health System Pharmacists, AHFS Drug Information 2012,* at 2526 (2012 ed.). Depakote is the proprietary name for valproate sodium, which is a drug primarily used to treat bipolar disorder. *Id.* at 2317.

**4.** Both Crise and his mother testified at their depositions that Crise was transported to the hospital by ambulance. An ER nurse also testified that she remembered seeing Crise entering the hospital on foot through the ambulance bay doors. Ordinarily, the ambulance bay doors are locked from the outside to prevent access by anyone but paramedics. Crise was not accompanied by paramedics, however.

Another ER nurse recalled Crise telling her that his mother had called an ambulance, but it had broken down en route to their house, so they had driven to the hospital instead.

He was complaining of chest pain and heart palpitations. Upon arrival in the E.R., Ms. Crise told the nurses that Crise had bipolar disorder and was experiencing a psychiatric crisis. She further informed the nurses that for the past five days Crise had not taken his prescribed psychiatric medications, eaten, had anything to drink, or slept.

Vicki Chitwood, R.N., the ER Head Nurse, immediately took Crise to Room 3 to have his cardiac condition evaluated.[5] Room 3 is ten to twelve feet from the nurses' station. It contains a stretcher that the patient assigned to the room uses as a bed.

At 2:45 p.m., Nurse Chitwood performed an initial triage assessment of Crise, recording her notes on a "Physical Assessment Flow Sheet" ("Nursing Assessment"). Ms. Crise and Mary were present at that time. Also present was Trina Dixon Holmes, a patient care technician ("PCT").

With respect to Crise's health history, Nurse Chitwood checked a box on the Nursing Assessment for "Mental Illness," making handwritten notations of "Bipolar" and "Acute Mania." She wrote that Crise was living with his family members and that in the last three months he had been prescribed Depakote 250 mg, Depakote 500 mg, and Trazadone 500 mg.[6]

Crise's chief complaint was "chest pain" that had started earlier that day. He reported a history of panic attacks and said he had not slept or taken his psychiatric medications for five days. In the neurological assessment part of the Nursing Assessment, Nurse Chitwood wrote that Crise was appropriately dressed; alert; oriented to person, place, time, and event; anxious and restless; and had clear but "pressured" speech.

---

5. Nurse Chitwood typically works in the ER in an administrative capacity only. Because the ER was understaffed on the day in question, she stayed after her shift ended to take a patient load.

6. Trazadone is an anti-depressant used to treat anxiety and major depression. *AHFS 2012, supra,* at 2425.

In the psychiatric assessment, Nurse Chitwood noted that, according to Ms. Crise, Crise was suicidal and had a history of prior suicide attempts. Specifically, Ms. Crise advised that, just a few months earlier, Crise had become manic and had run naked along a highway in Delaware. Crise "denie[d] active suicidal ideation," however, and was not homicidal. Nurse Chitwood checked the "auditory hallucinations" box on the Nursing Assessment form.[7]

Following Nurse Chitwood's initial evaluation, another ER nurse, Digma Lagmay, R.N., briefly took over Crise's care. At her request, Crise disrobed and donned a hospital gown. MGH staff performed a "sharps check" to make sure Crise did not have any weapons or sharp objects in his possession. MGH policy mandates that all psychiatric patients undergo a "sharps check." All of these tests were performed around 3:00 p.m.

Brian Finnegan, M.D., the attending physician in the ER that day, ordered blood and urine tests to evaluate Crise's cardiac function and determine whether he was under the influence of narcotics or alcohol. The latter tests are standard "psych labs." Nurse Lagmay inserted an intravenous ("IV") line, started IV fluids, administered oxygen, and performed an EKG.

According to Mary, while Crise was undergoing the EKG, Ms. Crise handwrote a note and gave it to a nurse at the nurses' station. At the top of the note, Ms. Crise wrote the date, the time Crise had arrived in the E.R., and his full name, date of birth, and address. She also wrote:

Diagnosis–Acute mania

Bipolar Mental Illness

---

7. In her deposition, Nurse Chitwood testified that she did not recall Crise reporting that he was experiencing any hallucinations. She explained that what appears to be a check mark in the box denoting auditory hallucinations actually is the tail end of another handwritten note she made on the Nursing Assessment form. She acknowledged, however, that she could not state with certainty that she did not check the box.

patient has not slept for 5 days

No sleep. Is Manic, delusional, hearing of voices. *Not eating or drinking.*

Allergic to Xyprexa.

*No Xyprexa.*

(Emphasis in original). At the bottom of the note, Ms. Crise listed Crise's current medications and dosages.[8]

At some point, Ms. Crise and Mary returned to the ER waiting room. They may have been directed to do so by staff because Crise did not want them with him or because the staff found Ms. Crise to be disruptive.[9] PCT Holmes overheard Ms. Crise protesting that she could not leave Crise alone because, if she did, he would leave the ER. She was "begging [them]" to watch him to make sure he did not leave.

At 3:20 p.m., Dr. Finnegan examined Crise. He already had reviewed the EKG results, which were normal. He recorded his observations on an "Emergency Physician Record." He noted that Crise was complaining of chest pain and heart palpitations that "come[ ][and] go[ ]" and "tightness" around his mid-sternum. Crise told Dr. Finnegan that he had not slept in three days and had not eaten "much" either. In addition to chest pain, Crise reported having a sore throat and a headache.

Dr. Finnegan reviewed Crise's records from prior admissions to MGH, noting the previous diagnoses of schizoaffective disorder, schizophrenia, bipolar disorder, and hypertension.

---

8. The nurses and the physician who treated Crise in the ER on December 31, 2008, deny having seen or read Ms. Crise's note. The Nursing Assessment form completed by Nurse Chitwood recounts the same list of medications and dosages as detailed in the note and uses language identical to that in the note to describe Crise's diagnoses, however. Also, the note is in MGH's records for Crise for December 31, 2008. It is marked with a patient identification sticker for Crise. MGH produced the note in discovery.

9. Some ER personnel testified that Ms. Crise and Mary left the ER treatment area within ten minutes of Crise's arrival, while others remember them being there much longer. Mary testified that they remained there at least until Crise was given the EKG.

He observed Crise to be oriented, with normal mood and affect; alert; and in "no acute distress." He observed that Crise appeared "anxious." Crise did not report being suicidal or homicidal and denied that he was experiencing hallucinations. Dr. Finnegan did not speak to Ms. Crise or Mary. Dr. Finnegan acknowledged during his deposition that ordinarily he speaks to family members when evaluating patients for psychiatric problems and, had he known that Ms. Crise and Mary were in the ER waiting area, he would have communicated with them.

Dr. Finnegan's clinical impression was that Crise was suffering from "anxiety, bipolar, mania, [and] chest pains." He concluded that the likely cause of the heart palpitations was anxiety. He wrote an order for Crise to be assessed by a crisis evaluator. Crisis evaluators are not physicians and do not work on-site at MGH. They are expected to arrive to perform an evaluation within 90 minutes of being contacted. It is MGH's policy that a crisis evaluator will not be contacted until a patient's blood and urine laboratory tests have been returned.

Around 4:30 p.m., Elizabeth Svehla, R.N., the ER charge nurse, took over Crise's nursing care.

At 4:41 p.m., Crise's lab work came back. Nurse Svehla reported to Dr. Finnegan that all the test results were normal. The results did not reveal the presence of alcohol or narcotics in Crise's system and confirmed that he had not been taking his psychiatric medications, as those drugs were present in his blood below any therapeutic level.

At 5:00 p.m., a crisis evaluator was called.

Throughout the more than two hours that Crise had been in the ER, he had remained in Room 3, which was "in [Nurse Svehla's] direct eyesight" from the nurses' station. Upon taking over his care, she began watching Crise to "make sure he [stayed] in the room." She observed him "climbing off of the stretcher [in his room] and being restless"; "pacing" around his room; and "occasionally venturing out and looking

at the other patients." On several occasions, Nurse Svehla or other hospital staff redirected Crise back to his bed.

PCT Holmes advised Nurse Svehla that Ms. Crise told her that Crise needed to be watched and was likely to run. She volunteered to act as a "sitter." A sitter is a hospital employee, usually a PCT, assigned to monitor a patient one-on-one. If the patient exhibits any harmful or dangerous behavior or attempts to leave, the sitter is to alert medical or security staff. According to PCT Holmes, Nurse Svehla responded that the ER did not have enough staff to assign a sitter and that Crise had been placed in Room 3, across from the nurses' station, so she (Nurse Svehla) could "eyeball" him.

Because Crise was exhibiting "increasingly restless" behavior, Nurse Svehla contacted Dr. Finnegan and requested medication to calm him down. At 5:30 p.m., Dr. Finnegan ordered that Crise be given 1 milligram of Ativan, a sedative, by IV. Nurse Svehla administered the Ativan.

Immediately thereafter, Crise asked to use the bathroom. Nurse Svehla escorted him to a bathroom and waited outside the door for him. He was in the bathroom for some time, causing Nurse Svehla to ask him to hurry up. When Crise came out of the bathroom, Nurse Svehla saw that he had pulled his IV out of his arm and was bleeding. She asked him why he had done that; he replied that "he didn't need it [and i]t was bugging him." Nurse Svehla bandaged the IV site but did not reinsert an IV.

After giving Crise the dose of Ativan, Nurse Svehla began "watch[ing]" him "more carefully" from the nurses' station, to make sure he did not become too sedated and to determine whether the medication was effectively calming him down. She kept a "peripheral eye on him at all times." He started pacing less, but was not lying down.

At 6:15 p.m., Nurse Svehla noticed that Crise no longer was in Room 3. She immediately checked the nearest bathroom, but he was not there. She checked a second bathroom and he was not there either. She then started asking other ER staff if they had seen him. She was advised that a patient had just

walked out a rear door of the E.R., causing an alarm to sound. Nurse Svehla walked through that door, which empties onto Howard Street, and looked around for Crise. When she did not see him, she went back inside, notified security, and called the Baltimore City Police Department ("BCPD"). Within ten to fifteen minutes, BCPD personnel notified MGH ER staff that officers had located Crise on the Howard Street Bridge. MGH staff asked the BCPD to "escort [Crise] back to the [ER]."

Apparently, upon exiting the ER through a rear door, Crise, wearing only his hospital gown and leaving his clothes behind, walked northbound on Howard Street for several blocks, in the direction of his home in Remington. When he was walking on the Howard Street Bridge, which is a part of Howard Street that spans Interstate 83 and areas surrounding that expressway, he saw several BCPD police cruisers traveling southbound on Howard Street, toward him. (These police were looking for Crise in response to the call from MGH). One police cruiser parked on the bridge and two police officers got out of it and slowly approached Crise. Crise turned around and walked southbound, away from the officers. The officers continued to approach. When they were within two to three feet of Crise he jumped over the side of the Howard Street Bridge, falling 30 to 40 feet onto concrete. He was transported by ambulance to the University of Maryland Shock Trauma Center. As noted, he fractured his pelvis, left wrist, right arm, and right leg.

In his deposition, Crise testified that he jumped off the bridge because he was "paranoid and delusional and [he] thought it wouldn't be such a big deal." He wanted to "get away from the police" and "[k]eep walking home."

On September 22, 2009, after waiving health claims arbitration and obtaining an order of transfer from the Health Care Alternative Dispute Resolution Office ("HCADRO"), Crise filed suit in the circuit court against MGH for medical negligence. He alleged that MGH owed him a duty of care; that it breached that duty by, *inter alia*, failing to thoroughly assess

his psychiatric condition and "supervise, observe and/or closely monitor" him; and that the breach of duty was the direct and proximate cause of the injuries he sustained when in a manic and psychotic state he jumped off the Howard Street Bridge.

Crise designated two medical experts to opine about the standard of care: Stephan Lynn, M.D., and Stephen Siebert, M.D., M.P.H. MGH also designated two medical experts on the standard of care: David A. Shank, M.D., and Gayle Galan, M.D. All were deposed during discovery.

Dr. Lynn, who signed Crise's certificate of merit in the HCADRO, is board-certified in Emergency Medicine and has practiced in that field for more than 30 years. He is the Director of the Emergency Department at St. Luke's Roosevelt Hospital in New York City, and is an associate professor of medicine and surgery at Columbia University. In the report attached to his certificate, he opined that "the applicable standards of care required Crise to have a constant observer [*i.e.,* a sitter] placed to monitor him [during his time in MGH's E.R.] due to his underlying history of schizophrenia and bi-polar disorder." He further opined that Crise's clinical presentation on December 31, 2008, in and of itself, required MGH either to assign a sitter to monitor him or to take "other type[s] of security measure[s] to ensure that [he] did not pose a danger to himself or others." According to Dr. Lynn, MGH's failure to take appropriate measures to prevent Crise from leaving the ER was the direct and proximate cause of his injuries.

On July 15, 2010, counsel for MGH deposed Dr. Lynn. The doctor elaborated upon the opinions in his report, testifying that MGH's ER staff failed to adequately assess Crise's anxiety, particularly in light of his medical history, and to recognize that it was escalating rapidly during his time in the ER. According to Dr. Lynn, the standard of care required that, as soon as Dr. Finnegan read the EKG results and ruled out acute cardiac distress as a cause of Crise's chest pain, Crise be placed in a safe and secure environment to await a psychiatric evaluation. Dr. Finnegan had ruled out acute

cardiac distress by 3:20 p.m., a little less than an hour after Crise's arrival in the ER and almost two hours before he walked out of the hospital. In Dr. Lynn's opinion, a "safe and secure environment" would have been a locked room. He further opined that, although less desirable, MGH could have satisfied the standard of care by assigning a sitter to monitor Crise "constantly." Dr. Lynn testified that any hospital staff member could have filled that role, so long as watching Crise was the sitter's sole responsibility.

Dr. Lynn also opined that when Crise was in the ER and when he left he was not competent to make rational decisions about his course of treatment and was a danger to himself and others. Under those circumstances, had MGH personnel been aware that Crise was attempting to leave the hospital, they could have taken steps to prevent him from doing so. Dr. Lynn opined about numerous additional breaches of the standard of care, including a delay of more than two hours after Crise arrived in the ER before a crisis evaluator was contacted; administration of an insufficient dose of Ativan; failure to reevaluate Crise's mental state in light of his escalating anxiety, as evidenced by his refusal to stay in his room and his ripping out his IV; and failure to maintain secure exits from the ER.

Dr. Siebert is a board-certified psychiatrist who works for the Baltimore County courts. In his August 27, 2010 deposition, he opined that Crise's clinical presentation on December 31, 2008, was consistent with his being in a manic and psychotic state and justified his being admitted to the hospital either voluntarily or involuntarily. Dr. Siebert further opined that, under the circumstances, the standard of care "required the hospital staff at [MGH] to keep [ ] Crise in the hospital," whether by assigning him a sitter, using a chemical restraint (*i.e.,* a more effective sedative), or using a physical restraint (*i.e.,* placing him in a secure room).

Dr. Shank, one of the two defense experts, opined in his August 2, 2010 deposition that a patient presenting to an ER who is "manic and . . . hearing voices" needs to be admitted to

the hospital. He explained that he had not "seen anything" in Crise's MGH records to suggest that that was Crise's clinical presentation on the day in question. He agreed that, if there was information of that sort in the medical record, his opinion regarding the "care that would have been expected to be delivered" would change. He further explained that, in the hospital where he works,[10] a patient who is deemed to be suicidal, homicidal, or incompetent will be watched by a hospital security guard or placed in a locked room.

Dr. Galan, the second defense expert, opined in her August 25, 2010 deposition that the standard of care requires a hospital to keep a patient who is exhibiting symptoms of psychosis in the ER at least until he or she has been evaluated to determine "whether the patient is able to care for [himself or herself] or [whether the patient is] demonstrating any risk of harm to [himself or herself] or others." She further opined, however, that observation of a patient "every few minutes" by a nurse is sufficient monitoring to satisfy the standard of care.

On August 25, 2010, MGH filed a motion for summary judgment. It attached six exhibits: the complaint; its answers to interrogatories; Crise's deposition; Crise's answers to interrogatories; Dr. Lynn's certificate of merit and attached report; and Dr. Lynn's deposition transcript.

MGH argued that, even crediting Dr. Lynn's opinion that it had deviated from the standard of care by failing "to have a constant observer [or 'sitter'] placed to monitor [ ] Crise" while in the E.R., there was "no causation between [MGH's] alleged negligence in failing to have a sitter and [Crise's] injuries." This was so, MGH asserted, because, had it assigned a sitter to Crise, the sitter would not have had any authority to physically intervene to prevent him from leaving the ER. Thus, Crise could have left the ER while he was being monitored; and, under those circumstances, MGH could have

---

10. The record does not include Dr. Shank's curriculum vitae and the excerpts of his deposition do not provide information about his education and practice area. We glean from his deposition testimony, however, that he practices Emergency Medicine.

satisfied its duty of care by contacting the police. As there was no evidence that compliance with the standard of care would have prevented Crise from leaving the E.R.; the hospital complied with its duty to notify the police; and Crise jumped off the bridge to elude the police, the chain of causation was broken by the arrival of the police on the Howard Street Bridge.

MGH pointed out that in deposition Crise testified that he left the ER because "nothing was happening." MGH argued that this evidence further showed that its allegedly negligent acts or omissions did not cause Crise's injuries. Crise did not testify that he left the ER with any intention of jumping off a bridge or hurting himself. Thus, but for his confrontation with the police, Crise would not have jumped off the Howard Street Bridge and would not have been injured.

In two related contentions, MGH also argued that Crise's claim was barred as a matter of law by the doctrines of contributory negligence and assumption of the risk. It asserted that Maryland employs an objective test for both doctrines and therefore Crise's conduct would be assessed not based upon his own, subjective mental state, but based upon the conduct of a reasonably prudent person under the circumstances. According to MGH, a reasonably prudent person would not act contrary to his own well-being by jumping off a bridge and would assume the risk of bodily harm if he did so.

Crise filed an opposition to the motion for summary judgment. He attached the discharge summary from his June 2008 admission to MGH; his MGH medical record from December 31, 2008; excerpts of the depositions of Nurses Svehla, Lagmay, and Chitwood, and of Dr. Finnegan; Ms. Crise's handwritten note (which, as mentioned, was in MGH's December 31, 2008 record for Crise); his own deposition; excerpts from the depositions of Drs. Shank and Siebert and from the deposition of Christopher Brooks, an MGH security guard who was present on December 31, 2008; and the BCPD report of the events of December 31, 2008, involving Crise.

Crise argued that his clinical presentation on December 31, 2008, coupled with his psychiatric history, showed that he was in a "psychotic, delusional, and hypermanic state making him a danger to himself or others." Citing the deposition testimony of MGH's own expert, Dr. Shank, he asserted that, under those circumstances, MGH owed him a duty of care to use one of several options to ensure that he was safe and secure while he awaited crisis evaluation and likely admission to the hospital's psychiatric unit. Those options included assigning a sitter to observe him one-on-one and to alert ER staff if he tried to leave; placing him in a locked and secure room; or using effective chemical restraints.

With respect to causation, Crise argued that if MGH had assigned a sitter to observe him continuously, the sitter could have alerted ER staff immediately if he attempted to leave. Medical and security personnel could have prevented him from leaving the hospital by an assortment of interventions, up to and including physical restraint. He argued, moreover, that there was no evidence that physical restraint would have been necessary to keep him in the hospital, as, according to Nurse Svehla's testimony, Crise had been easily redirected to his room on numerous occasions before he absconded. Also, the evidence on the summary judgment record showed that, before December 31, 2008, he had voluntarily admitted himself to MGH's psychiatric unit at least four times. Thus, Crise argued, had MGH complied with its duty of care by, at a minimum, assigning a sitter to watch him, he likely would not have tried to leave the ER at all, and, if he had made an attempt to leave, he likely would not have been able to do so surreptitiously and without the knowledge and intervention of MGH personnel.

Crise also argued that contributory negligence and assumption of the risk are defenses properly reserved to the jury and, because of his psychiatric state on the night in question, his conduct could not be assessed properly based upon an objective reasonable man standard.

On September 20, 2010, MGH filed a motion *in limine,* seeking to exclude certain evidence at trial. Crise filed an opposition on October 4, 2010.[11] The parties attached many of the same materials already submitted on the summary judgment record. In addition, Crise attached excerpts of the depositions of Dr. Galan, PCT Holmes, and Mary. In her deposition, PCT Holmes testified that she personally told Nurse Svehla that Ms. Crise had told her that Crise would flee if he were not monitored constantly and that he was likely to harm himself if he left the E.R.; and that she (PCT Holmes) had volunteered to act as a sitter to monitor Crise.

In her deposition, Mary testified that on the day in question her mother was "constantly . . . telling [E.R. staff] to watch [Crise] [because] he might run away." She further testified that, after the EKG was performed, a nurse accompanied Crise to the bathroom. While he was in the bathroom, Mary could hear him "making all of these, like, loud grunting noises like he was a dog." Also, she later observed Crise eating in the ER without utensils, "like an animal."

Trial was scheduled to commence on October 5, 2010. That morning, the court heard argument on the motions for summary judgment and *in limine.* The court ruled on the *in limine* motion, but deferred ruling on the summary judgment motion. Thereafter, a jury was selected and sworn and the proceedings were adjourned for the day.

The next morning, before the jurors were brought into the courtroom, the trial judge began discussing the arguments advanced in the motion for summary judgment and opposition. The judge then announced that on his own initiative he was "raising under Rule 2–502, certain questions which must be resolved before the case can go forward." The judge opined:

The first [question] is, what legal authority does [MGH] have to prevent a patient who is voluntarily admitted him-

---

11. While a copy of Crise's opposition appears in the record extract, the opposition itself does not appear in the record. The parties do not dispute that it was filed. In any event, the same exhibits were later attached to Crise's motion for reconsideration.

self [sic] from leaving because he was dissatisfied with [MGH's] services.

And if [MGH] did not have the legal authority to prevent [Crise] from leaving, can a claim of negligence for allowing [Crise] to leave the hospital be allowed to proceed as a matter of law?

In this case, there is no allegation that [MGH] had the legal authority to hold [Crise] against his will. But rather, it is argued that [MGH] could have used better practice by providing [Crise] with a sitter.

However, the sitter would have had no legal authority to prevent [Crise] from voluntarily leaving the hospital, which he chose to do because he was dissatisfied with the hospital's service.

In fact, [Crise] stated that he left because he felt like, quote, "Nothing was happening," end of quote, and felt disrespected when he was told not to use the bathroom.

[Crise] also contends that a note was provided to [MGH] giving notice that [Crise] was suffering from delusions. Even taking into consideration the potential evidentiary value of that note, the question remains, what legal authority does the hospital have to detain a voluntarily admitted patient prior to an evaluation being conducted.

Here, [Crise] was initially triaged and was seen by Dr. Brian Finnegan, who observed [Crise] as oriented, with normal mood and affect. Dr. Finnegan also diagnosed [Crise] with anxiety, bipolar disease, mania, and chest pain. He ordered that [Crise] be seen by a crisis evaluator.

However, the fact Dr. Finnegan ordered an evaluation of a voluntarily admitted patient does not give the hospital the authority to prevent that patient from leaving the hospital before such an evaluation.

Furthermore, in [Crise's] triage evaluation, [Crise] denied having active homicidal or suicidal thoughts. The Court's analysis may have been different if there was indication that [Crise] was entertaining suicidal thoughts. But the facts before the Court clearly indicate such was not the case.

In addition, [Crise] does not allege that he was suicidal, so this issue is moot and is merely stated to emphasize that this Court recognizes the fact that [MGH] was notified that [Crise] had a prior history of suicide attempts. But in this instance, it was determined that [Crise] had no such thoughts.

In fact, the record indicates that [Crise] continually stated that he was not having suicidal thoughts, and the reason he jumped from the Howard Street Bridge was that he could— why he left the hospital was so that he could go home, and he jumped from the Howard Street Bridge because of his confrontation with the police.

Thus, under the facts before the Court, it is clear that [MGH] did not have the authority to prevent [Crise], a voluntarily admitted patient, from voluntarily choosing to leave the hospital when he chose to leave.

Therefore, as a matter of law, under Rule 2–502, the Maryland Rules of Procedure, the Court, considering the matter sua sponte, finds that [MGH] cannot be negligent for [failing to] prevent[ ] [Crise] from leaving the hospital, nor can they be liable for any injuries or damages occurring after he left the hospital's care. And a judgment will be entered in favor of the defendants for those reasons.

At the conclusion of the court's ruling, Crise's lawyer expressed surprise, pointing out that MGH had not argued in its summary judgment motion that it did not owe Crise a duty of care and complaining that he had not been afforded "an opportunity to address the concerns of the Court . . . through the evidence . . . and the testimony." MGH's counsel asked the court to clarify whether it intended to reach the arguments raised on summary judgment. The court replied that it would not address the motion for summary judgment because its ruling under Rule 2–502 had rendered that motion moot.

On October 22, 2010, Crise filed a timely motion for reconsideration or, in the alternative, for new trial. He argued that numerous provisions of Maryland law authorize hospitals to detain patients for evaluation for eventual admission and that

MGH was exercising such authority (albeit too late) when it contacted the BCPD and directed BCPD officers to find Crise and return him to the ER. He further argued that, even if MGH did not have the legal authority to "forcibly detain" him, it still was obligated to make "reasonable efforts" to prevent him from leaving the hospital before he was seen by the crisis evaluator.

By order entered January 24, 2012, the circuit court denied Crise's motion for reconsideration or new trial. The order reads, in relevant part:

> This matter arose out of a claim for negligence against [MGH] as the result of injuries sustained by the Plaintiff on December 31, 2008, when the Plaintiff jumped from the Howard Street Bridge in Baltimore City, Maryland. The Plaintiff contends his injuries were the result of medical negligence by the Defendant.
>
> The Plaintiff went to [MGH] on the date of his injuries and then walked out of the facility. He contends [MGH] was responsible for preventing him form [sic] eloping from their facility and but for their failure to do so he would not have been injured by jumping from the bridge. At the time he jumped he was being approached by Baltimore City Police who were attempting to locate him at the request of [MGH].
>
> The Plaintiff had a history of psychiatric problems. When he went to the hospital he was given a hospital gown in exchange for his street clothes and was examined by Dr. Brian Finnegan, the emergency room doctor, who ordered that a crisis evaluator see the Plaintiff for further psychiatric evaluation. (The plaintiff was diagnosed with anxiety, bipolar disorder and mania prior to the date of the incident giving rise to the action *sub judice.*[) ] Before that evaluation could be performed the Plaintiff who had not been admitted and who was not under any other restriction, other than his own motivation, left the hospital.
>
> ... The negligence alleged to have been committed was essentially that [MGH] had the duty to prevent the [Plain-

tiff] from injuring himself when he jumped from the bridge, but under circumstances that it did not have the authority to restrain him or hold him.

All theories as to how such injury could have been prevented are pure speculation. That the Plaintiff did have the legal right to leave and exercised that right and was subsequently injured when he jumped from the bridge does not establish any legal liability on the part of [MGH].

This timely appeal followed. We shall include additional facts as necessary to our discussion.

## DISCUSSION

Crise contends the trial court erred as a matter of law in ruling that MGH did not owe him a legal duty of care. He asserts that when he was in the ER he was under the care of Dr. Finnegan and other hospital staff members and was awaiting a psychiatric evaluation; and, under Maryland law, these health care provider-patient relationships gave rise to a duty of reasonable care. The nature and scope of that duty was in dispute and was within the province of the jury to decide based on the evidence, including the testimony of expert witnesses. Crise maintains that whether MGH had the legal authority to detain him in the ER was not dispositive of the issue of duty of care; and even if it were, the court's conclusion that MGH had no such authority was legally incorrect and contrary to the evidence before the court. Crise also asserts that the court abused its discretion by addressing the duty of care issue under Rule 2–502 and by doing so without giving him notice or an opportunity to be heard on the issue of the existence *vel non* of a legal duty.

MGH responds that the court properly used Rule 2–502 as a vehicle to decide the "purely legal issue" of whether MGH owed Crise a duty of care. It maintains that the court's determination that MGH "ultimately could not have prevented [Crise]—an otherwise voluntarily admitted patient who was not a danger to himself or others—from leaving the E.R." was

based on non-clearly erroneous factual findings and was legally correct.

We conclude that the issue decided by the trial court, while framed by it as a purely legal question, was not; that, to the extent that any part of the issue was legal, the court incorrectly decided it; that the issue required factual determinations that were for the jury to decide, and therefore the court decided an issue that was not within its sole province and thus was not susceptible to a Rule 2–502 decision; and, beyond that, the court abused its discretion not only by invoking Rule 2–502 but also by doing so without affording the parties prior notice and an opportunity to be heard. For all these reasons, the judgment of the circuit court shall be reversed.[12]

### (a)

### *History and Purpose of Rule 2–502*

Rule 2–502, entitled "Separation of questions for decision by court[,]" states:

> If at any stage of an action a question arises that is within the sole province of the court to decide, whether or not the action is triable by a jury, and if it would be convenient to have the question decided before proceeding further, the court, on motion or on its own initiative, may order that the question be presented for decision in the manner the court deems expedient. In resolving the question, the court may accept facts stipulated by the parties, may find facts after receiving evidence, and may draw inferences from these facts. The proceedings and decisions of the court shall be on the record, and the decisions shall be reviewable upon appeal after entry of an appealable order or judgment.

---

**12.** MGH takes the position that even if the trial court's Rule 2–502 ruling was incorrect we nevertheless should affirm the judgment based upon the grounds raised in its motion for summary judgment. We decline to address any of the summary judgment arguments. The trial court ruled only that the summary judgment motion was moot. Given our ruling, the motion is not moot.

The committee note to the rule gives examples of when Rule 2–502 does not apply:

> When a question defined by this Rule involves one of the matters listed in Rule 2–322 [governing preliminary motions], the question should be raised and decided under the provisions of that Rule. When a judgment is sought and there is no genuine dispute as to any material fact, the question should be raised and decided under Rule 2–501 [governing summary judgment]. When the question is not a question within the sole province of the court to decide but it would nonetheless be convenient or less prejudicial to conduct a separate trial on the issue, it is appropriate to proceed under Rule 2–503(b) [governing separate trials].

Rule 2–502 was derived from former Rule 502 and was adopted effective July 1, 1984, as part of the comprehensive revision of the Maryland Rules of Civil Procedure. Among other things, the 1984 revision created a unitary "civil action," under Rule 2–301, thus "eliminat[ing] distinctions between law and equity for purposes of pleadings, parties, court sittings, and dockets." Committee note to Rule 2–301. The revision was not intended however, to " 'abolish all differences between legal and equitable claims.' " *Higgins v. Barnes,* 310 Md. 532, 534, 530 A.2d 724 (1987); *LaSalle Bank, N.A. v. Reeves,* 173 Md.App. 392, 404–05, 919 A.2d 738 (2007) (quoting 9 *Md. Law Encyclopedia, Equity* § 5 (2000)).

Former Rule 502 was "meant to fuse an equity procedure with a legal one [and was] originally designed to clear away preliminary or extraneous issues before trial." *Harris v. Stefanowicz Corp.,* 26 Md.App. 213, 219, 337 A.2d 455 (1975). Entitled "Separate Trial of Issue of Law," former Rule 502 stated:

> (a) *Question of Law–Stay–Appeal.* At any stage of the action, the court may, on application of any party or of its own motion if it shall appear that there is a question of law which it would be convenient to have decided before going further, direct such question to be raised for the court's decision in such manner as the court may deem expedient.

All such further proceedings as may be rendered unnecessary by the decision of such question shall upon the decision be stayed. Such proceedings as show the questions so decided and the decision thereon shall form a part of the record and be reviewable upon appeal after final judgment. (b) *Inferences by Court.* The court may draw all inferences of facts or law that the court or jury could have drawn from the facts agreed or shown as if the same had been offered in evidence upon a trial before the court or before the court and a jury.

The language of section (a) was derived from Maryland Code (1951), Article 75, section 134,[13] and Article 16, section 237.[14] The language of section (b) was derived from Maryland Code (1951), Article 26, section 16, which "deal[t] with agreed statements of fact, special cases stated and special verdicts."[15] *Id.* at 219 n. 3, 337 A.2d 455.

---

**13.** This section, entitled "Special Case Stated" provided:

> At any stage of an action or proceeding in a court of law, the court may, on application of any party in interest, or of its own motion if it shall appear that there is a question or questions of law which it would be convenient to have decided before going further, direct such question or questions to be raised for the court's decision, either upon a special case stated, or in such other manner as the court may order; and all such further proceedings as may be rendered unnecessary by the decision of such question or questions shall upon the decision be stayed, and such special case stated, or such proceedings as show the questions so decided and the decision thereon shall form a part of the record and be reviewable on appeal after final judgment in the case.

**14.** This section stated:

> If it appear to the court, either from the pleadings or otherwise that there is a question of law in any case, which it would be convenient to have decided before any evidence is given, or any question or issue of fact is tried, the court may make an order accordingly, and may direct such question of law to be raised for the opinion of the court, either by special case or in such other manner as the court may deem expedient; and all such proceedings as the decisions of such questions of law may render unnecessary may therefore be stayed.

**15.** Section 16 of Article 26 stated:

> Upon all agreed statements of facts, all special cases stated, and all special verdicts, the court shall be at liberty to draw all inferences of facts or law that court or jury could have drawn from the facts so

The minutes of meetings of the Court of Appeals Standing Committee on Rules of Practice and Procedure ("Rules Committee") leading up to the 1984 revisions elucidate the intended purpose and scope of Rule 2–502. At a March 6, 1981 Rules Committee meeting, Judge McAuliffe, Chairman of the "Trial Rules Subcommittee," presented for consideration "Reorganization Rule 2–503," which later became Rule 2–502. At that time, the first clause of the reorganized rule read, in pertinent part,

> if ... at any stage of the action ... there is a question of law which it would be convenient to have decided before going further, the court may upon request or on its own motion, direct such question to be raised for the court's decision in such manner as the court may deem expedient.

Minutes of March 6, 1981, at 26. The remainder of the proposed rule did not differ substantively from the current rule. The Trial Rules Subcommittee also included an explanatory note, for the benefit of the Rules Committee, stating in relevant part that the reorganized Rule "eliminate[s] troublesome language, currently found in section b of Rule 502, which the subcommittee felt might encourage a court, under the guise of determining a question of law, to make factual findings in derrogation [sic] of a litigant's right to trial by jury."

Judge McAuliffe explained that by "collaps[ing] the two sections of Rule 502" into one paragraph, the reorganized rule would "make it clear that when a question of law requires the resolution of questions of fact, the court may receive evidence in order to make the necessary findings and may draw inferences from the facts show." *Id.* at 26. He emphasized, however, that factual findings may not be made by the court "in derrogation [sic] of a litigant's right to trial by jury because the court may only find those facts and draw those inferences which are necessary to determine a question of law." *Id.* at 26–27. Moreover, if, in deciding a legal issue, the court resolves disputed facts, and those same disputed facts

---

agreed or stated as if the same had been offered in evidence upon a trial before the court or before the court and a jury.

are relevant to a determination of an issue reserved to the jury, the jurors will "not be precluded from deciding those facts again." *Id.* at 29.

In addressing the Rules Committee, Judge McAuliffe offered the issues of public necessity in an eminent domain case and the bar of limitations as examples of legal questions susceptible of resolution by the court under the reorganized rule. In each such instance, the issue for the court to decide is one of law, but factual findings may be "[i]ncidental to the determination." *Id.* at 27. For example, in ruling on the legal question whether a cause of action is barred by the applicable statute of limitations, the court might need to take evidence about when the plaintiff knew or should have known that the cause of action accrued.

Rules Committee members suggested modifications to the reorganized Rule 2–502 to make clear that only those questions of law "reserved for decision by the court" are within the ambit of the rule and that the court may find facts only when necessary to the resolution of the legal question. *Id.* at 29. The reorganized Rule was referred back to the subcommittee "with the request that the subcommittee consider making the Rule expressly applicable only to those cases where a question of law requires that disputed facts be resolved." *Id.*

On June 19–20, 1981, Judge McAuliffe again presented reorganized Rule 2–502 to the Rules Committee for consideration. As requested, language had been added to clarify that only those questions "within the sole province of the court to decide, regardless of whether the case is being tried by a jury," may be decided under the Rule and to allow the court to receive evidence and find facts "[i]f resolution of the question requires facts to be established." Minutes of June 19–20, 1981, at 10. A committee note was added, which is substantively identical to the current note. Reorganized Rule 2–502 then was approved by the Rules Committee with minor alterations and, ultimately, was adopted by the Court of Appeals.

In keeping with Judge McAuliffe's remarks to the Rules Committee, Rule 2–502 (and its predecessor rule) has been

invoked most commonly in the context of eminent domain cases. *See, e.g., State Rds. Comm'n v. 370 Ltd. P'ship,* 325 Md. 96–101, 599 A.2d 449 (1991) (court decision on valuation date); *Mercantile–Safe Deposit & Trust Co. v. Mayor & City Council of Baltimore,* 308 Md. 627, 631, 521 A.2d 734 (1987) (court decision on existence of a compensable right in property to be condemned); *State Rds. Comm'n v. Pumphrey,* 260 Md. 633, 637, 273 A.2d 81 (1971) (court decision on valuation date); *State Rds. Comm'n v. Orleans,* 239 Md. 368, 371, 211 A.2d 715 (1965) (same); *Wash. Suburban Sanitary Comm'n v. Santorios,* 234 Md. 342, 343, 199 A.2d 206 (1964) (court decision on public necessity). In such cases, the only issue within the province of the jury is the amount of compensation due to a party with an interest in the property to be condemned. *See Bouton v. Potomac Edison Co.,* 288 Md. 305, 309–10, 418 A.2d 1168 (1980).

Other issues that have been deemed suitable for preliminary determination under Rule 2–502 (or its predecessor Rule) are the *res judicata* effect of a prior decision, *Simpkins v. Ford Motor Credit Co.,* 389 Md. 426, 440, 886 A.2d 126 (2005), and *Beach v. Mueller,* 32 Md.App. 219, 224 n. 3, 359 A.2d 232 (1976); demand futility in a stockholder suit, *Werbowsky v. Collomb,* 362 Md. 581, 621, 766 A.2d 123 (2001), and *Bender v. Schwartz,* 172 Md.App. 648, 663–64, 917 A.2d 142 (2007); a limitations defense, *Watson v. Dorsey,* 265 Md. 509, 511, 290 A.2d 530 (1972); statutory interpretation, *State v. Sherman,* 234 Md. 179, 181, 198 A.2d 71 (1964); and whether a defendant possesses qualified immunity, *Artis v. Cyphers,* 100 Md.App. 633, 653–54 & n. 3, 642 A.2d 298, *aff'd,* 336 Md. 561, 649 A.2d 838 (1994).

As we explained in *Bender,* a circuit court decision under Rule 2–502, on a discrete issue that is solely within the court's province, is essentially a trial by the court on the merits of that issue. 172 Md.App. at 664, 917 A.2d 142. The court may hear evidence and make factual findings necessary to its decision of the discrete issue that is within its province

to decide. Therefore, the court's decision on the issue is reviewed on appeal under Rule 8–131(c). *Id.*

**(b)**

*The Trial Court's Application of Rule 2–502*

In the instant case, the trial court, using the information before it on the summary judgment and *in limine* records, made first level factual findings, drew inferences, and concluded that, as matter of law, because (in its view) MGH had no legal authority to "hold [Crise] against his will," it had no duty to prevent Crise from leaving the ER and therefore could not be liable in negligence for the injuries Crise sustained after he "voluntarily" left the ER and jumped off the Howard Street Bridge. The trial court decided what it described as a legal duty of care issue under Rule 2–502. We conclude that, as a matter of law, MGH, through its agent health care providers, owed Crise, a patient being treated in the ER, a duty of care; and the nature and scope of that duty was not an issue "within the sole province of the court" so as to be susceptible of determination under Rule 2–502.

 "Establishment of a legal duty is a prerequisite to a claim of negligence because '[t]here can be no negligence where there is no duty that is due; for negligence is the breach of some duty that one person owes to another.'" *Jones v. State,* 425 Md. 1, 19, 38 A.3d 333 (2012) (quoting *McNack v. State,* 398 Md. 378, 395, 920 A.2d 1097 (2007) (citations and internal quotation marks omitted)). *See also Jacques v. First Nat'l Bank,* 307 Md. 527, 531, 515 A.2d 756 (1986) (stating that the elements in any cause of action for negligence are "a duty owed. . . ., a breach of that duty, a legally cognizable causal relationship between the breach of duty and the harm suffered, and damages"). An action for medical malpractice, being a type of negligence action, requires proof, among other elements, of a duty of care owed by the defendant to the plaintiff. The plaintiff must prove the applicable standard of care; that the standard of care was violated by the defendant; and that the violation proximately

caused the injury for which damages are sought. *See Sterling v. Johns Hopkins Hosp.*, 145 Md.App. 161, 169, 802 A.2d 440 (2002); *Jacobs v. Flynn*, 131 Md.App. 342, 354, 749 A.2d 174 (2000).

██ Ordinarily, the duty of care in a medical malpractice action arises from the health care provider-patient relationship. *See Dehn v. Edgecombe*, 384 Md. 606, 620, 865 A.2d 603 (2005) ("It is the general rule that recovery for malpractice against a physician is allowed only where there is a relationship between the doctor and patient"); *Dingle v. Belin*, 358 Md. 354, 367, 749 A.2d 157 (2000) (same); *Sterling*, 145 Md.App. at 169–70, 802 A.2d 440 (same). That duty, stated more fully, is to exercise the degree of care or skill expected of a reasonably competent health care provider in the same or similar circumstances. *Shilkret v. Annapolis Emergency Hosp. Assoc.*, 276 Md. 187, 200, 349 A.2d 245 (1975) (the doctor-patient relationship gives rise to a duty on the part of the doctor "to use that degree of care and skill which is expected of a reasonably competent practitioner in the same class to which [the doctor] belongs, acting in the same or similar circumstances"). *See* Md.Code (2013 Repl.Vol.), § 3–2A–02(c) of the Courts and Judicial Proceedings Article (Plaintiff in medical malpractice claim must prove that the care given by the "health care provider [was] not in accordance with the standards of practice among members of the same health care profession with similar training and experience....").

██ Thus, when a health care provider-patient relationship exists, the "duty of care" issue is not whether any duty exists but the nature and scope of the duty. With few exceptions, the applicable standard of care, *i.e.*, the nature and scope of the duty owed, is proven by expert testimony (as is the issue whether the applicable standard of care was breached). *Rodriguez v. Clarke*, 400 Md. 39, 71, 926 A.2d 736 (2007) (explaining that the defendant's "use of suitable professional skill" in the practice of medicine and proximate cause usually are the subject of expert testimony) (internal quotation marks omit-

ted); *Univ. of Md. Med. Sys. Corp. v. Gholston,* 203 Md.App. 321, 337, 37 A.3d 1074 cert. denied, 427 Md. 65, 46 A.3d 406 (2012) (describing a "classic battle of the experts" regarding causation in an action for medical negligence and affirming the denial of a motion for JNOV by the hospital on that issue); *Hahn v. Suburban Hosp. Assoc.,* 54 Md.App. 685, 695, 461 A.2d 7 (1983) (stating it is "axiomatic that a qualified medical expert can render an opinion as to whether a hospital did or did not comply with applicable standards of care ... permitting a trier of fact to determine whether the hospital was negligent"), *overruled on other grounds by Newell v. Richards,* 323 Md. 717, 731–32, 594 A.2d 1152 (1991).

 To be sure, the question whether any duty of care is owed by a defendant to a plaintiff, whether in a medical malpractice or any other negligence action, is one of law. *See, e.g., Pace v. State,* 425 Md. 145, 154, 38 A.3d 418 (2012) (affirming circuit court's grant of motion to dismiss negligence action against the State based on an alleged duty owed to a public school student to ensure she received a school lunch that met her specific dietary needs); *Doe v. Pharmacia & Upjohn, Co., Inc.,* 388 Md. 407, 414, 879 A.2d 1088 (2005) (in answer to a certified question of law, determining that as a matter of law a company cultivating and harvesting the HIV virus for use in HIV antibody tests owed no legal duty to its employees' spouses). The committee note to Rule 2–502 makes plain, however, that a legal question such as whether any duty of care exists in an action for negligence is not proper for decision under that Rule. The issue properly can be raised in a motion to dismiss, under Rule 2–322, which includes among other grounds for dismissal failure to state a claim upon which relief may be granted, *see* subsection (b)(2). If on the facts alleged no duty of care exists, a claim is not stated upon which relief may be granted. Likewise, the issue whether a duty of care exists as a matter of law properly can be decided on summary judgment, under Rule 2–501, if the facts have been developed in discovery and are not in genuine material dispute. In neither situation is the issue of duty of care suitable for decision under Rule 2–502, however. *See*

*Harris v. Stefanowicz Corp.,* 26 Md.App. at 218, 337 A.2d 455 (observing that former Rule 502 "is as different from summary judgment in purpose and effect as is an apple from an orange.").

 MGH did not file a motion to dismiss asserting that it did not owe Crise a legal duty of care, nor did it advance such an argument in its motion for summary judgment. The reason for this is obvious. Maryland law is clear that, as a patient in the MGH E.R., Crise was owed a duty of care by the MGH health care providers who were assigned to and participated in his care. It is undisputed that on December 31, 2008 Crise was admitted to the E.R., where he was assigned a room, triaged, given a nursing assessment, examined by an ER doctor, administered a sedative, and scheduled for evaluation by a crisis counselor. On these undisputed facts, there is no merit to any contention that Crise was not owed a duty of care by the MGH ER health care providers. If, for example, Dr. Finnegan had carelessly ordered a lethal dose of Ativan, instead of the proper dose, and Crise had been given the lethal dose and had died, any assertion that Dr. Finnegan and MGH did not owe Crise a duty of care would be ludicrous.

The trial court mistook the legal question whether *any* duty of care was owed by MGH to Crise for the factually disputed (and complicated) question of the nature and scope of the duty of care owed. Using the evidence submitted on the summary judgment and *in limine* records (which is not proper to do under Rule 2–502 in any event), the court made factual findings and concluded that the nature and scope of the duty of care owed by MGH to Crise could not exceed the hospital's legal authority to detain him. In other words, if MGH lacked the authority to hold Crise in the ER for evaluation, it did not owe him any related duty of care, such as to monitor him to prevent him for attempting to abscond.

Unlike the issues typically resolved under Rule 2–502, which are "discrete" and separate from the underlying merits, *see Werbowsky,* 362 Md. at 621, 766 A.2d 123 (demand futility is a

"perfect candidate" for resolution under Rule 2–502 because it "is a preliminary issue that is discrete, that does not go to the merits of the underlying complaint, ... and ... that is resolvable by the court"), the nature and scope of MGH's duty of care to Crise required resolution of factual disputes that were intertwined with factual disputes regarding the breach, *vel non,* of that duty and the causal connection between any breach and Crise's injuries. All of these disputes were within the province of the jury, not the court, to decide.

The court's oral ruling from the bench, later elucidated in its memorandum opinion denying the motion for reconsideration, paints a picture of Crise as a rather ordinary ER patient with a psychiatric history who was not suicidal or homicidal, had come to MGH on his own accord, and, having become dissatisfied with MGH's services, simply chose to leave and go home. It does not mention that Crise did not tell anyone at the ER that he was leaving; that he exited through an alarmed door at the end of a back hallway off the E.R.; that he left his clothes behind and walked outside on a cold night wearing only a hospital gown; and traversed several blocks north on Howard Street, a busy road in the middle of Baltimore City. The ruling goes on to say that when Crise came upon the police as he was walking on the Howard Street Bridge, he decided to jump off the bridge because the police (two officers, walking slowly) were approaching him.

In making its findings, the court rejected, explicitly and implicitly, Crise's own deposition testimony and that of his fact witnesses, as well as information contained in Crise's medical records. All of that evidence could support a reasonable finding that Crise was in a manic and psychotic state and was becoming increasingly agitated and detached from reality. He and others reported that he was hearing voices, his speech was "pressured," he had not taken his psychiatric medications for five days, and had not eaten or slept for days. Moreover, while in the E.R., he pulled out his IV, walked from "room" to "room" wearing only his hospital gown, ate food like an animal and made strange noises, exhibited a level of agitation that required sedation, and was not calmed sufficiently from the

sedative that he would stay in his assigned bed. Evidence that was not credited by the court but could have been credited by the jury showed that family members warned the MGH nurses that if not watched closely, Crise would try to leave; that he had had a recent dangerous experience of running naked along a Delaware highway; and that PCT Holmes had volunteered to watch Crise but was told not to because the ER was too busy. Further, there was evidence that, after Crise absconded (the word used in the medical record), ER personnel called the police to fetch him and bring him back—something they would not have done if they thought his leaving was just an ordinary event—and that when Crise reached the Howard Street Bridge he could not rationally process the presence of the police because, as Crise himself put it, he was so "paranoid and delusional that [he] thought [jumping off the Howard Street Bridge] wouldn't be such a big deal."

In deciding the issue it described as the existence of a legal duty of care, but in fact was the issue of the nature and scope of an established duty of care, the trial court not only rejected the latter version of the events of December 31, 2008, and all the evidence on which it was based, but also rejected the expert opinions of Drs. Lynn and Siebert. As noted above, both were prepared to testify, based on Crise's manic behavior, lack of sleep, failure to take his medications, auditory hallucinations, and increasing agitation, that he was incompetent to make rational decisions about his own well-being and was a danger to himself; and therefore the standard of care owed by MGH and its agents to Crise required that measures be taken to keep Crise safe and secure until he was psychiatrically evaluated. According to these experts, this could have been accomplished (in order of less to more invasive therapy) by assigning a sitter to watch him, so any expression of interest on his part in leaving, or any attempt to leave, would have been witnessed immediately and communicated to the doctors and nurses, and could have been responded to by a verbal request for cooperation, redirecting or diverting his

emotions, increasing or changing his sedative, or placing him in a locked room.

The findings by the trial judge rendered irrelevant what in fact was the central standard of care question in the case: Given that MGH owed a duty of care to Crise, as its patient, did Crise's condition create an obligation on the part of MGH's personnel to take measures (as Crise's experts would testify) to control his actions, so as to make it unlikely that he even would try to leave the ER and likely that he would be redirected from doing so before he succeeded in walking out. The court, having discounted the evidence that Crise was a danger to himself, determined that the standard of care could not reasonably require having a sitter observe Crise, because the sitter would have no authority to detain him if he tried to leave.

As Dr. Lynn opined, however, whether a sitter could detain Crise made no difference. If a sitter had been assigned to Crise, that person's sole responsibility would have been to constantly observe him and report any adverse behavior to medical personnel. Had the assigned sitter seen Crise attempt to leave Room 3 and move toward an alarmed exit door, medical personnel could have been alerted immediately and intervened before Crise left. Dr. Lynn voiced the opinion, based upon information in Crise's medical file and his history of voluntary admissions for psychiatric treatment, that a verbal intervention alone more likely than not would have been sufficient to redirect him away from the exit door. (In fact, earlier on the day in question, he had responded positively to verbal directions, such as to stay out of other patients' rooms). In addition, Dr. Lynn opined that, if a verbal intervention would not have worked, the mere fact that a patient was attempting to leave the ER clothed only in a hospital gown in winter would have given rise to a duty on the part of MGH health care providers to reevaluate his competency and assess whether he was a danger to himself which, contrary to the "legal conclusion" reached by the trial judge, would permit the hospital to detain Crise involuntarily. See Md.Code (2009 Repl.Vol.) § 10–625 of the Health General Article ("HG")

(authorizing emergency involuntary admission of an individual for psychiatric evaluation). Thus, there was evidence that, if credited by a jury, could have led reasonable jurors to conclude that the standard of care at the very least required MGH to have Crise monitored by a sitter; and had that duty been satisfied, he would not have absconded from the ER and injured himself.

What is critical is that the issue of the scope and nature of MGH's duty of care to Crise in this case was not a matter "within the sole province of the court" to decide, and that in endeavoring to decide this issue preliminarily, the court "under the guise of determining a question of law," made factual findings "in der[ ]ogation of [Crise]'s right to trial by jury." Minutes of the June 19–20, 1981 Rules Committee Meeting at 11. For this reason, the judgment in favor of MGH must be reversed.[16]

### (c)

### *Procedure Followed Under Rule 2–502*

Although the substance of the trial court's decision is sufficient to support reversal of the judgment, the procedure that was followed, or not followed, is worthy of comment. In *Harris,* 26 Md.App. at 213, 337 A.2d 455, we considered the procedural prerequisites under section (a) of former Rule 502. The Rule then permitted a court to determine an issue of law preliminarily by "direct[ing] [the] question to be raised for the court's decision in such manner as the court may deem expedient." We explained that because Rule 502(a) was drafted using "lifted language" from Art. 75, § 134 and Art. 16, § 237, "certain language which had been in the equity act (originally Acts of 1886, Ch. 334) was omitted to facilitate the revision." That language "included a phrase more clearly

---

**16.** The circuit court deemed the motion for summary judgment to be moot based on its determination under Rule 2–502. As noted earlier, given our resolution of this appeal, however, that motion is no longer moot. We express no opinion as to the validity of any of the arguments advanced in that motion.

conveying the procedural safeguard to be followed when it appeared to the chancellor that there was a question of law that it would be convenient to decide[:] ' . . . the Court may make an order accordingly, and may direct such question of law to be raised for the opinion of the Court.' " *Id.* at 219, 337 A.2d 455. In the light of the history of the rule and the plain language, we concluded that Rule 502(a) required that the parties be afforded "some warning and opportunity to prepare" before the court could determine an issue of law. *Id.* at 220, 337 A.2d 455.

 Under Rule 2–502, the court on motion or on its own initiative may "order" that a question within its sole province to decide be "presented for decision" in the manner the court deems expedient. We think it plain that this language, like the language of former Rule 502(a), requires that the parties at least be afforded adequate notice and an opportunity to prepare before a court decides an issue under Rule 2–502. *Cf. Phillips v. Venker,* 316 Md. 212, 221–22, 557 A.2d 1338 (1989) (holding that a plaintiff was deprived of due process when the court heard argument and granted summary judgment in favor of the defendant during a conference call to discuss a scheduling matter); *Burdick v. Brooks,* 160 Md.App. 519, 524–27, 864 A.2d 300 (2004) (mother denied due process when the court modified custody without affording her notice or an opportunity to prepare); *Van Schaik v. Van Schaik,* 90 Md. App. 725, 739, 603 A.2d 908 (1992) (denial of due process when court decided merits of a custody dispute with "no notice at all that it would be considered nor any discussion during the hearing itself of that issue").

Our conclusion is buttressed by the fact that Rule 2–502 proceedings ordinarily are in the nature of a "mini-trial," in which the court may "take evidence, and resolve questions of fact, including credibility of witnesses." Paul V. Niemayer & Linda M. Schuett, *Maryland Rules Commentary,* 363 (3d ed.2003); *see also* March 6, 1981 Rules Committee Minutes at 28 (unlike proceedings on summary judgment, the proposed Rule 2–502 would involve "a trial-like procedure"). Without

advance notice, the parties cannot gather the necessary evidentiary materials, determine whether to summons witnesses to appear, or decide whether to stipulate to certain facts.

In the instant case, neither party was given advance notice of the court's plan to decide the issue of a legal duty as a preliminary question under Rule 2–502. The court raised the issue for the first time, *sua sponte,* at the commencement of the second day of trial, following jury selection but before opening statements. Moreover, the court did not take any evidence prior to rendering its decision, relying instead on the evidentiary submissions before it on summary judgment [17] and announced its decision from the bench without providing either party an opportunity to be heard. Following its ruling, counsel for Crise expressed shock at the court's decision, as he had not been apprised that the court was going to consider any issue under Rule 2–502, and therefore had had no opportunity to "address the concerns of the Court" by presenting evidence. Nor did counsel for Crise have the opportunity to prepare to argue why Rule 2–502 was not a proper procedure to be following in any event. Even if the standard of care issue had been proper for decision under Rule 2–502, which it was not, the court abused its discretion by holding a proceeding under Rule 2–502 without giving the parties notice that it was going to do so, to enable them to prepare.

**JUDGMENT REVERSED. CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR**

---

**17.** The evidentiary submissions before the court on summary judgment also were not intended to form the basis for a "trial on the merits" under Rule 2–502. *See Bender v. Schwartz, supra,* 172 Md.App. at 664, 917 A.2d 142. In the context of a summary judgment proceeding, MGH, as the moving party, had the burden to demonstrate that there existed no genuine dispute of material fact and it was entitled to judgment as a matter of law. Md. Rule 2–501. Crise could survive the motion by showing that there existed "a genuine dispute as to a material fact by proffering facts which would be admissible in evidence." *A.J. Decoster Co. v. Westinghouse Elec. Corp.,* 333 Md. 245, 261, 634 A.2d 1330 (1994). He was under no obligation to place all of his evidence before the court at that stage, nor could he have been expected to anticipate that he would need to submit evidence necessary to decide an issue not raised on summary judgment.

FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY THE APPEL-LEE.