PETER PAUL OLIVER *v.* STATE OF MARYLAND

[No. 801, September Term, 1974.]

*Decided April 9, 1975.*

The cause was argued before MORTON, MENCHINE and LOWE, JJ.

*John W. Sause, Jr., District Public Defender,* with whom was *Alan H. Murrell, Public Defender,* on the brief, for appellant.

*Bernard A. Raum, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General* and *Donaldson C. Cole, Jr., State's Attorney for Cecil County,* on the brief, for appellee.

LOWE, J., delivered the opinion of the Court.

The facts leading to the conviction of Peter Paul Oliver by a jury in the Circuit Court for Cecil County are of little consequence to this appeal. His conviction of daytime housebreaking and petit larceny is of major consequence, however, as is his burglary exoneration, if to a lesser degree. We are concerned here with two advisory instructions — one by the judge to the deadlocked jury, the other by the bailiff in response to a question presented by its foreman. We will treat the issues inversely, first disposing of the bailiff's instruction, and reserving for last that of the judge, in deference to processional protocol.

## The Bailiff's Mistake

From a most sparse record, it would seem that during jury deliberations the bailiff was called upon by the foreman to "deliver a message that he gave me." Whether the "message" was the question that followed we are not told. It is clear, however, that the foreman did ask the bailiff a question of a technical legal nature. The bailiff explained the incident immediately after the jury verdict but prior to their dismissal.

"A. He wanted to know what was the difference between illegal entering and breaking and entering.

Q. Did you answer?

A. I did. I told him I didn't know whether there was any difference or not.

Q. And what did you tell him you thought?

A. I said I thought there wasn't any difference at all. That's what I said."

It seems hardly necessary to discuss whether the questionable advice was correct or in error. The impropriety of the bailiff's having breached the quarantine of a juror's deliberations,[1] and possibly contaminating that sterile atmosphere is cause enough to bowdlerize the intrusion. As pointed out by the trial judge, had appellant brought this to the court's attention before the final verdict, the peregrine might have been extruded far more efficiently than by having to grant a new trial:

"Now, apparently Counsel was aware of this, I suppose, when it happened; certainly before the Foreman announced the verdict, and Counsel should have advised the Court immediately when he learned that this had happened and brought it to the Court's attention then, and then action necessary could have been taken. It seems to me that Counsel waited too long and any right that he had to raise this point he waived by not bringing it immediately to the Court's attention. And under the rule, there's a rule, I can't cite the rule, but I know there is a rule which so requires anyone having knowledge of any impropriety, that it be immediately made known to the Court."[2]

---

1. It is the bailiff himself who is responsible for the sanctity of the jury deliberations. Form Number 23 of the Rules of the Second Judicial Circuit provides that the bailiff take a special oath relative to that responsibility and addresses him personally in that regard:

"Do you solemnly promise and declare (or affirm) under the penalty of perjury that you will well and truly keep this jury together in some convenient room, without meat or drink; that you will not suffer any person to speak to them *nor speak to them yourself,* unless it be to ask them whether they are agreed upon their verdict, without leave of the Court?" [Emphasis supplied].

2. We too are unable to cite such rule.

Yet we are not willing to "suppose" as did the trial judge that appellant or his counsel was aware of the communication before the verdict when such supposition was necessary to the court's conclusion that "There's nothing prejudicial . . . " to the accused. Nor can we find appellant's *supposed* hesitancy in enlightening the court as effecting a waiver of his protected right, especially in the face of possible prejudice.

In *Parker v. Gladden,* 385 U. S. 363 a bailiff commented upon the guilt of an accused and speculated that an appellate court would correct any error in a guilty verdict. The Supreme Court placed considerable emphasis upon "the fact that the official character of the bailiff — as an officer of the court as well as the State — beyond question carries great weight with a jury which he had been shepherding . . . ." *Parker, supra,* at 365.

The nature of the advice given weight by the custodial status of the bailiff [3] shifted the burden to the State to exorcise the spectre of prejudice raised by the revelation of the remark. We think that is especially true in light of the strong differences among the jurors indicated by their deadlock. *Parker, supra,* at 365 noted that this factor is also an element to consider. In that case "the jurors deliberated for 26 hours, indicating a difference among them as to the guilt of [the accused]." We find ourselves in close accord with the sentiments twice expressed by the Supreme Court:

> "As we said in Turner v. Louisiana, 'it would be blinking reality not to recognize the extreme prejudice inherent' in such statements . . . ." *Id.*

"It is impossible to keep the fountains of justice clean and pure, unless the jury is free from contamination." *Shackleford v. Commonwealth,* 185 Ky. 51, quoted in Anno., 41 A.L.R.2d 227, 229.

### The Judge's Error

The jury's deadlock brings us to the second question raised

---

**3.** The leadership status of the recipient of the remark — here, the foreman, — is neither insignificant nor to be ignored.

by appellant dealing with the court's "Allen Charge." Not only do we find ourselves critical of the bailiff's advice to the foreman, but we are equally concerned with that given the jury when it returned after less than one and one-half hours of deliberation. A colloquy between court and foreman indicated a deadlock which the foreman stated could not be broken with further consideration and deliberation. Thrice he repeated such opinion. For the fourth and final time the court asked:

"THE COURT: Do you want to try a little longer and see what can happen?"

Whereupon the foreman once again replied:

"I really don't think it would do any good. We're deadlocked.

THE COURT: You don't think it would do any good. Well, this is rather surprising to the Court. I will say that. Well, under the circumstances, I suppose there's nothing we can do. I understand from the note that you're pretty well evenly divided.

THE FOREMAN: Yes, sir.

THE COURT: Counsel, come to the Bench.

(Whereupon, a conference took place at the Bench, out of hearing of the jury.)"

Instead of declaring a mistrial, the court took the "Allen" route: [4]

"THE COURT: Ladies and gentlemen of the jury, I am going to send you back another half hour and let you talk this over and see what you can do, because it's difficult for me to see how, on the issues of this case, you can't come to some sort of agreement on it. I am going to send you back for another half hour and see what you can do to it.

You have got a responsibility and a duty, and this case has been a day and a half. Now, it's expensive.

---

4. Allen v. United States, 164 U. S. 492.

> We try to conclude these things if we can. This would mean this trial in the case — it means it's got to be tried all over again. We'll have to get all these witnesses back and have the same thing.
>
> The Court would ask you to go in and see if you can't sit down and reason this thing out. Discuss the facts. See if you can come to an agreement on what the facts are and apply the law as the Court has instructed you, and see if you can't come in here with a verdict on this case. Now, return to the jury room."

A trial judge cannot be too careful when delivering what has been termed a "dynamite charge . . . designed to blast loose a deadlocked jury." *Green v. United States*, 309 F. 2d 852 (5th Cir.). Although this Court has not gone to the extent of saying that there "is small, if any justification for its use" as did *Green, supra*, we have repeatedly admonished that "it should be resorted to with care, restraint, and circumspection." *Miller v. State*, 10 Md. App. 157, 160.

The giving of the charge is a matter within the sound discretion of the presiding judge, *Fletcher v. State*, 8 Md. App. 153, 155, after remand, *Hamilton v. State*, 12 Md. App. 91, aff'd. 265 Md. 256. In determining whether that discretion was abused we must decide:

> ". . . whether the wording of the charge and the time, circumstances and conditions under which it is given would threaten or tend to coerce the jury into a verdict which is contrary to any individual juror's free will and judgment . . . . The question to be determined is whether resort to the instruction forced or helped to force an agreement which would not otherwise have been reached except for the intimidating or coercive effect of the charge upon some jurors or whether it merely initiated a new train of real deliberation which ended the disagreement and enabled each juror conscientiously and fully to subscribe to the unanimous verdict." *Id*. at 155-156.

Parenthetically we should interject our observation that time is but one factor to consider in determining abuse, *Cf.*, *Lang v. State*, 6 Md. App. 128, *cert. denied*, 254 Md. 719. Conversely, we noted in *Fletcher* that the single factor of having deliberated for one hour and five minutes did not by itself justify "returning [the jurors] to the court room and giving an Allen charge." 8 Md. App. at 158. Indeed, we decided that the instruction in *Fletcher* was "clearly premature and we cannot say that its use was unprejudicial." 8 Md. App. at 159.

While the time comparison here is significant, it is not alone compelling under the circumstances: a) that the jury came forward to explain its deadlock as opposed to being recalled by the judge; and b) that the facts of this case lacked serious complexity.

Of greater concern we think is "the wording of the charge," and again by comparison with *Fletcher*,[5] the wording used here is found wanting. Appellee contends that the "circumstances and conditions"[6] indicate that it was not coercive. It argues that the court's limiting the return of the jury to "another half hour" lessens the coercive impact. The

---

5. The charge found prejudicial in Fletcher was:

> "THE COURT: Mr. Foreman, Members of the jury, the Court observes that you have had this case under consideration now for about an hour and a half. We do not feel that there is anything technical to be decided here. It's a question of arriving at a judgment. For that reason we instruct you that there are many cases in which absolute certainty cannot be expected. Although the verdict must be the verdict of each individual juror as a result of his own convictions and not a mere acquiescence in the conclusions of his fellows, each one of you should examine the questions submitted with candor and with a proper regard and deference to the opinion of the others.

> "It is your duty to decide this case if you can conscientiously do so, and you should listen with a disposition to be convinced to each other's arguments. If your views are contrary to those of the vast majority, you should consider whether your views, which make no impression on the minds of so many equally intelligent jurors, are correct.

> "So you will return to the jury room and deliberate further in light of these instructions." Fletcher, 8 Md. App. at 154-155.

6. Fletcher, 8 Md. App. at 155 says that ". . . whether the giving of the instruction constitutes reversible error in a given case depends not only on the language used but upon the conditions and circumstances attendant under which the instruction is given."

State then notes that at the end of that time they did indeed come back and ask for a few minutes more. Ten minutes thereafter they arrived at a verdict. This sequence, interpreted by appellee, would show the judge's "suggestion" that the jurors try a little longer was met with so cooperative a spirit (thus negating a sense of coercion) that they even communicated their progress by keeping him advised that they would only be a few minutes more.

More ominously viewed from the opposite trial table, the words as well as the "conditions and circumstances attendant" were coldly received. Initially the appellant notes the peculiar circumstance that at 1:00 p.m. no lunch had been served the jury, nor were they so provided before again being caused to retire. The half hour limitation is viewed as a deadline auguring foreboding consequences made more apparent by the bypass of the noon meal. They were given just 30 minutes to meet their "responsibility and duty" to keep the trial from "being tried all over again" for a "day and a half" at which time "We'll have to get all these witnesses back and have the same thing. . . ." They were not asked, says appellant, they were cajoled to "discuss the facts. See if you can come to an agreement on what the facts are and apply the law as the Court has instructed you, and see if you can't come in here with a verdict on this case." And finally they were ordered "Now, return to your jury room." The appellant would further note that the circumstances of their request through the bailiff after the lapse of 29 minutes of their allotted 30, that "They want a few more minutes" is indicative of their Pavlovian response to the precise words judicially imparted. Satisfied that he had broken the deadlock, says appellant, the judge at last eased his time limitation and told the bailiff:

> "Well, apparently, they are making progress. Tell them to take all the time they want."

Neither interpretation do we accept, yet the conflict is indicative of the possible coercive impact of the trial court's unfortunate choice of words.

> "The jury system rests in good part on the

> assumption that the jurors should deliberate patiently and long, if necessary, and arrive at a verdict — if, but only if, they can do so conscientiously. It is improper for the court to interfere with the jury by pressuring a minority of the jurors to sacrifice their conscientious scruples for the sake of reaching agreement." *Green v. United States, supra,* 309 F. 2d at 854.

Since we have concluded that the bailiff's legal advice to the foreman of a deadlocked jury was reversible error, we are relieved from deciding whether the Allen-type charge given would itself constitute such abuse of discretion as to independently warrant reversal. We have analyzed the charge in order to caution the trial judge should the retrial result in jurors with similarly differing opinions.

In *Kelly v. State,* 16 Md. App. 533, affm'd. 270 Md. 139, 142 the Court of Appeals declined "to imprison the trial judges of this State within the walls of foreordained verbiage." However, Judge Digges wrote for the Court "guidelines for the employment of the Allen-type charge." 270 Md. at 143. In so sensitive a semantic minefield we commend the periodic rereading of *Kelly* by the trial bench.

Because the bailiff's legal advice was improper, the judge's instruction suspect and significant facts in controversy,

> *Judgments reversed and case remanded for a new trial.*