Circuit Court for Baltimore County
Case No. 03-C-14-011973 MM

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 822

September Term, 2016

_____

REGINALD J. DAVIS

v.

MARK ARMACOST

_____

Eyler, Deborah, S.,
Kehoe,
Rodowsky, Lawrence F.,
(Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Kehoe, J.

_____

Filed:  September 1, 2017

This appeal raises two questions, both fairly well settled in other jurisdictions but apparently matters of first impression in Maryland. The first is whether the trial court in a medical malpractice action was wrong to give jury instructions on negligence framed in terms of the conduct of a reasonable person. The second is whether the court abused its discretion when, in response to a question from the jury during its third day of deliberations, it imposed a one-hour deadline to conclude deliberations.

Mark Armacost sued his neurosurgeon, Reginald J. Davis, M.D., for malpractice and failure to obtain informed consent. At the end of a five-day trial, the court gave its instructions to the jury. Over Dr. Davis's objection, the jury's charge included an instruction on the general negligence concept of foreseeable circumstances—describing how "a reasonable person changes conduct according to the circumstances and the danger that is known or would be appreciated by a reasonable person" in addition to an instruction couched in terms of the standard of care that should be employed by a reasonably competent health care provider engaged in a similar practice and acting in similar circumstances.

During its third day of deliberations, the jury sent a note to the court asking what would happen if it could not reach a unanimous verdict. The court told the jurors that a mistrial would result from continued deadlock and also issued a modified *Allen* charge. In addition, the court requested the jurors to deliberate for another hour but also told them that they would not be asked to return the following day. About an hour later, the jury returned a verdict in favor of Mr. Armacost on the malpractice issue and in favor of Dr. Davis on the informed consent claim.

On appeal, Dr. Davis raises two questions, which we have rephrased:

1. Did the trial court commit reversible error by giving the foreseeable circumstances instruction (Maryland Civil Pattern Jury Instruction 19:3), prejudicially altering or heightening the duty owed by Dr. Davis to patient Mr. Armacost?

2. Were the court's supplemental instructions unduly coercive?

As we will explain, we conclude that the trial court should not have given the foreseeable circumstances instruction nor, for that matter, another instruction defining negligence framed in terms of the conduct of a reasonable person. The court also erred in attaching a seeming one-hour deadline for the jury to reach a verdict after disclosing that a mistrial would result from a failure to reach a unanimous decision and issuing a modified *Allen* charge. Each error warrants reversal.

## Background

On January 17, 2012, after years of neck and shoulder pain and a recent onset of numbness in his right hand, Mr. Armacost consulted with Dr. Davis, the chief neurosurgeon at the Greater Baltimore Medical Center (GMBC). They discussed both surgical and nonsurgical treatments, and Mr. Armacost ultimately agreed to Dr. Davis's recommendation of a four-level anterior cervical discectomy and fusion surgery. Dr. Davis performed the procedure on March 1, 2012, and removed the damaged discs from Mr. Armacost's cervical spine.[1]

---

[1] The procedure is explained in Shan-Jin Wang et al., *Four-level anterior cervical discectomy and fusion for cervical spondylotic myelopathy*, 24 J. of Orthopaedic Surgery 338, 339 (2016).

Mr. Armacost's recovery was not a smooth one. Although he expressed no concerns in the first few weeks following the surgery, Mr. Armacost contacted Dr. Davis and GBMC several times between March and August, by telephone and by visiting the emergency room. He complained of a "pin-point opening" at the end of his incision and, later, of chest pain and episodic and progressive numbness in his left arm. A nurse found no active drainage from the opening, and X-rays showed that the hardware from his fusion procedure was well placed. Mr. Armacost had no fever. Nonetheless, at one appointment he was given oral antibiotics, and Dr. Davis eventually ordered a CT myelogram[2] to attempt to figure out the cause of Mr. Armacost's symptoms. Mr. Armacost took more than a month to schedule that procedure, but it was eventually performed on July 20. Dr. Davis interpreted the CT myelogram as normal.

On August 17, 2012, Mr. Armacost came to the GBMC emergency room reporting swelling and tenderness in his neck, redness near the incision, fever and chills. The "pin-point opening" had developed into an abscess. A doctor drained the abscess, and the fluid tested positive for a methicillin-sensitive Staphylococcus aureus bacterial infection[3]—some five months post operation.

---

[2] A CT myelogram is a radiographic contrast study of the spinal subarachnoid space and its contents, made using a contrast dye and computed tomography. *CT* and *Myelogram*, Stedman's Medical Dictionary (2016).

[3] Staphylococcus aureus is a common type of bacteria that can cause skin and bloodstream infections, as well as pneumonia. Unlike methicillin-resistant Staphylococcus aureus (MRSA), methicillin-sensitive Staphylococcus aureus (MSSA) can be treated with antibiotics. Staphylococcus aureus *in Healthcare Settings*, Centers for Disease Control and Prevention, https://www.cdc.gov/hai/organisms/staph.html.

On September 3, 2014, Mr. Armacost filed a statement of claim with the Health Care Alternative Dispute Resolution Office. Mr. Armacost waived arbitration, and on November 3, 2014, he sued Dr. Davis and GBMC for malpractice and a failure to obtain informed consent.

At trial, Mr. Armacost's expert witness testified that the fusion procedure performed on Mr. Armacost, although performed well,[4] was not medically necessary and was not appropriate for someone of Mr. Armacost's age and overall health condition. The same expert also told the jury that Dr. Davis and other members of GBMC's staff were too slow in diagnosing and treating Mr. Armacost's post-operative infection. Dr. Davis's experts, on the other hand, testified that Dr. Davis had complied with the standard of care in determining that Mr. Armacost was a candidate for the fusion surgery and that Dr. Davis had obtained Mr. Armacost's informed consent to the operation after appropriate disclosures. An infectious diseases expert testified that Mr. Armacost's infection, diagnosed in mid-August, had been present for only a couple of weeks before it was caught; in other words, it hadn't been lingering for months, undetected by Dr. Davis's staff. [5]

---

[4] The plaintiff's expert witness, Gary Lustgarten, M.D., said Dr. Davis "did a great job. Technically he did everything right."

[5] The expert testified that staphylococcus aureus infections are aggressive; the bacteria double in number every two to four hours. The witness opined that, if such an infection had been present since April, when Mr. Armacost began to complain of post-surgery pain, it would have killed Mr. Armacost by the time it was diagnosed in August.

The jury was excused for deliberation in the afternoon of May 23, 2016. On May 25, the jury returned a verdict for Dr. Davis on the informed consent issue but for Mr. Armacost on the malpractice issue, awarding him $329,000 in damages. Dr. Davis appeals from that judgment, challenging parts of the initial instructions and the court's supplemental instruction given in response to a note from the jury. The content and context of those instructions are discussed in detail below.

## ANALYSIS

### I. The standard-of-care instructions

The first part of Dr. Davis's appeal focuses on the court's instructions to the jury at the close of the five-day trial. One instruction combined the substance of Maryland Civil Pattern Jury Instructions 19:1 (defining negligence) and 19:3 (explaining the general-negligence concept of foreseeable circumstances) (emphasis added):

> Negligence is doing something that a person using *reasonable care* would not do, or not doing something that a person using *reasonable care* would do.
>
> *Reasonable care* means that caution, attention or skill a *reasonable person* would use under similar circumstances.
>
> A *reasonable person* changes conduct according to the circumstances and the danger that is known or would be appreciated by a *reasonable person*. Therefore, if the foreseeable danger increases, a *reasonable person* acts more carefully.[6]

The trial court also instructed the jury on the requisite standard of care for physicians in the context of medical malpractice specifically:

---

[6] This language tracks, verbatim, that of Maryland Civil Pattern Jury Instructions 19:1 ("Definition") and 19:3 ("Foreseeable Circumstances").

A health care provider is negligent if the health care provider does not use that degree of care and skill which a reasonably competent health care provider engaged in a similar practice and acting in similar circumstances would use.[7]

After all the instructions were given, Dr. Davis objected:

[Defendant's Counsel[8]]: I respectfully except to your decision to give the model pattern jury instruction 19:3, foreseeable circumstances. . . .

I believe giving the foreseeable circumstances instruction confuses the notion of whether or not Doctor Davis had to see into the future as to what may or may not happen with Mr. Armacost and therefore had a heightened duty to act in a different way. . . .

The question for Doctor Davis in this case is . . . was he negligent, did he do a surgery that wasn't indicated, did he fail to advise the Plaintiff about the surgery, and did he fail to properly appreciate the signs and symptoms of infection postoperatively.

There are no facts in this case which would suggest that Doctor Davis had any duty beyond the normal standard that would apply to a health care professional. . . .

The Court: Why don't we do this, it's 10:05 and the jury—

[Defendant's Counsel]: I'm done.

The Court: Good. Okay.

\* \* \*

[Plaintiff's Counsel]: In responding to that, Your Honor, I think that the—

The Court: I don't need you to respond to that.

---

[7] This language tracks, verbatim, that of Maryland Civil Pattern Jury Instruction 27:1 ("Health Care Providers—Standard of Care").

[8] GBMC, a co-defendant at the trial level, was found liable only as Dr. Davis's employer and did not join in this appeal. Any mention of "Defendant" or "Defendant's Counsel" in excerpts from the trial transcript refers to Dr. Davis or his counsel.

[Plaintiff's Counsel]:     Very well. We have no exceptions for the Plaintiff.

The Court:                Okay. All right. One divisive issue.

The court did not otherwise respond to Dr. Davis's objection or modify the instructions.

After the instructions were given to the jury, trial counsel gave their closing arguments. During the plaintiff's closing argument, counsel made the following comment to the jury (emphasis added):

> What do you look to if you want to *ignore all of the expert testimony*? You could do that in this case. It is your right [to] credit what you want to credit and ignore what you want to ignore.

The jury was sent to deliberate with a printed copy of the court's instructions and a verdict sheet to guide deliberation. The questions on the verdict sheet relevant to this appeal read as follows:

1. Do you find that [Dr. Davis], and [GMBC] as his employer, were negligent in their treatment of [Mr. Armacost]?

2. Do you find the negligence of [Dr. Davis], and [GBMC] as his employer, caused injury to [Mr. Armacost]?

The jury answered both questions affirmatively.

Dr. Davis argues that the trial court committed reversible error by giving the foreseeable circumstances instruction, prejudicially heightening the duty owed to the plaintiff patient, Mr. Armacost. According to Dr. Davis, the contested instructions, sounding in general negligence, modified the standard of care to which Dr. Davis was expected to adhere, inviting the jury to compare his conduct to that of a reasonable person without his specialized knowledge or skill. Dr. Davis contends that instructing the jury about foreseeable circumstances permitted the jury to speculate about inapplicable legal

7

principles and implied there was some type of foreseeable danger that required Dr. Davis to change his conduct accordingly.

Mr. Armacost's response is straightforward: The instructions given were correct because the general rules of negligence apply to malpractice claims, which sound in negligence. Because the instructions were not erroneous, Mr. Armacost argues, they could not be prejudicial.[9]

We hold that giving the challenged instruction constitutes reversible error because (1) pattern jury instructions framed in terms of the conduct of a reasonable person are inapplicable in a medical malpractice case and (2) the context surrounding the given instruction did not dispel a probability of prejudice to Dr. Davis.

## A. The standard of review

"We review a trial judge's decision whether to give a jury instruction under the abuse of discretion standard." *CSX Transp., Inc. v. Pitts*, 430 Md. 431, 458 (2013) (citing *Conyers v. State*, 354 Md. 132, 177 (1999)). Error will be found if the given instruction is not supported by evidence in the case. *Rustin v. Smith*, 104 Md. App. 676, 680 (1995). However, the court will only overturn a jury verdict and grant a new trial based on an

---

[9] At oral argument, Mr. Armacost suggested that Dr. Davis's challenge to the instruction on reasonable care (MPJI-Cv 19:1) is not preserved for appellate review. This is a debatable point—although trial counsel's objection was directed at MPJI-Cv 19:3, counsel did make it clear that any general negligence instruction was inappropriate.

In any event, we will address both MPJI-Cv 19:1 and MPJI-Cv 19:3 because neither instruction should have been given for the same reasons and the issue is likely to recur on remand.

erroneous instruction if the appealing party can show that it rises to the level of prejudicial error. *Fry v. Carter*, 375 Md. 341, 355 (2003).

### B. The general negligence instructions were erroneous.

It is true, as Mr. Armacost notes in his brief, that "the general principles which ordinarily govern in negligence cases also apply in medical malpractice claims." *Shilkret v. Annapolis Emergency Hosp. Ass'n*, 276 Md. 187, 190 (1975) (citing *Benson v. Mays*, 245 Md. 632, 636 (1967)). As in other negligence cases, a plaintiff alleging medical malpractice must prove the standard elements of a negligence case—among other things, a breach of duty or a lack of the requisite skill or care on the part of the defendant physician or other health care provider. *Univ. of Md. Med. Sys. Corp. v. Gholston*, 203 Md. App. 321, 330 (2012).

However, "whereas the conduct of the average layman charged with negligence is evaluated in terms of the hypothetical conduct of a reasonably prudent person acting under the same or similar circumstances, the standard applied in medical malpractice cases must also take into account the specialized knowledge or skill of the defendant." *Shilkret*, 276 Md. at 190–91 (1975) (citing W. Prosser, *Torts* 32 (4th ed. 1971)). That is why Maryland law has maintained, since the 1889 decision of *State v. Housekeeper*, a separate standard of care in medical negligence cases, expecting of doctors "[t]hat reasonable degree of care and skill which *physicians and surgeons* ordinarily exercise in the treatment of their patients." 70 Md. 162, 172 (emphasis added). Modern formulations require that physicians "exercise the degree of care or skill expected of a *reasonably*

*competent health care provider* in the same or similar circumstances." *Crise v. Maryland*

*General Hosp., Inc.*, 212 Md. App. 492, 521 (2013) (emphasis added).[10]

The reason for the distinction between the standards was made clear in Marcus Z.

Shar & David E. Manoogian, *The Medical Malpractice Law of Maryland* 3 (2d ed. 1992):

> As members of a "learned profession" doctors are expected to possess knowledge and skill in the context of their vocation surpassing that of other "reasonable men," and are therefore expected to conduct themselves in conformity with that heightened experience and training. [T]he law prohibits courts or juries from dictating how medicine is to be practiced on the basis of what might "seem right." Proof of medical negligence must therefore differ somewhat from the traditional "reasonable man" standard applicable to tort actions generally.

Because of this special standard of care, expert testimony is essential in almost all

medical malpractice claims to determine whether a doctor has been negligent. *DeMuth v.*

*Strong*, 205 Md. App. 521, 539 (2012) (citing *Brown v. Meda*, 74 Md. App. 331, 342

(1988)). Expert testimony is not required in only the rarest of cases in which the average

juror can determine independently that the physician was negligent—by amputating the

wrong leg, for example. *DeMuth*, 205 Md. App. at 539. This is because medical

malpractice cases are usually more complex than general negligence claims. *Puppolo v.*

*Adventist Healthcare, Inc.*, 215 Md. App. 517, 534 (2013) (citing *Barnes v. Greater*

*Baltimore Medical Center, Inc.*, 210 Md. App. 457, 481 (2013)). "[T]o ask the jury to go

beyond professional standards to determine whether it was reasonable for the defendant

---

[10] *See also* § 3-2A-02 of the Courts and Judicial Proceedings Article (A plaintiff in medical malpractice claim must prove that the care given by the "health care provider [was] not in accordance with the standards of practice among members of the same health care profession with similar training and experience").

to follow a particular medical course of treatment would in effect ask for the jury's medical judgment—something that no member of the jury is likely to be capable of giving" without the aid of expert medical testimony. Kenneth S. Abraham, *The Forms and Functions of Tort Law* 82 (4th ed. 2012).

No reported Maryland appellate opinion has explicitly addressed the suitability of general negligence or foreseeable circumstances instructions in medical negligence cases. But courts in other states presented with the issue have decided that instructions on ordinary care, foreseeability of risk and other general negligence principles muddle or misstate the applicable standard of care in malpractice cases. For example, in *Hales v. Pittman*, 576 P.2d 493, 498 (Ariz. 1978), the Supreme Court of Arizona affirmed the trial court's refusal to give jury instructions framed in terms of ordinary care, "as required of laymen," in a medical malpractice case. "[T]he physician incurs liability because of his breach of the standard of care applicable to physicians on account of their special knowledge." *Id.* What constitutes "reasonable care" is already covered by instructions "framed in terms of the skill and learning of a neurosurgeon." *Id.*

Similarly, in *Cromer v. Children's Hosp. Med. Ctr. of Akron*, 29 N.E.3d 921, 931 (Ohio 2015), the Supreme Court of Ohio found that a trial court erred when it gave jury instructions on foreseeability of harm in a medical malpractice case. "[I]n most medical negligence cases, [the] foreseeability of a risk of harm related to the medical treatment is conceded, leaving no need for a jury instruction on foreseeability." *Id.* at 934. Even if foreseeability of harm were at issue in the case, the court maintained, it would still be "inappropriate to view foreseeability in terms of a layperson's 'ordinary' standard of

11

care." *Id.* at 933. The jury should not have been given an instruction comparing the doctors' conduct to that of "a reasonably careful person." *Id.*

For these reasons, it is wrong to instruct juries "that a greater risk to the patient creates a higher duty in the physician." 1 David W. Louisell and Harold Williams, *Medical Malpractice* § 8.04(1)(a) (Gordon L. Ohlsson ed., 2017). Those authors point to two representative decisions. The Ohio Court of Appeals held in *Hinkle v. Cleveland Clinic Found.*, 823 N.E.2d 945, 960 (Ohio Ct. App. 2004), that no case law would justify giving an instruction on "greater danger" in a medical malpractice case. The Supreme Court of South Carolina agreed in *Pittman v. Stevens*, 613 S.E.2d 378 (S.C. 2005), holding such an instruction "inappropriate" in medical malpractice cases because "[e]very medical decision encompasses varying degrees of danger. *Id.* at 381.

By including Maryland Civil Pattern Jury Instruction 19:3 in the jury's charge, the trial court three times invited the jury to determine whether Dr. Davis was negligent by invoking the conduct and perception of a "reasonable person" instead of the accepted practice among Dr. Davis's similarly skilled peers. This error was reinforced by including Maryland Civil Pattern Jury Instruction 19:1, which focuses on "reasonable care" and the "caution, attention or skill [of] a reasonable person." While the instructions on general negligence and foreseeable circumstances may have been correct statements of negligence law in Maryland, they failed to account for a medical doctor's specialized knowledge and skill. The appropriate standard of care for Dr. Davis (Maryland Civil Pattern Jury Instruction 27:1)—also given by the court—already takes account of the risks involved in the decision to operate and in any post-operative treatment. The

standard also rightly asks jurors to consider how a *physician*—not the average reasonable person—responds to those risks.

Medical malpractice claims are not general negligence claims, and so jury instructions on general negligence, although correct statements of Maryland law, are not supported by the facts of a case centered on the allegedly negligent conduct of a physician. Accordingly, we hold that the trial court erred in giving general negligence instructions in a medical malpractice case.

### C. The general negligence instructions were also prejudicial.

As noted above, even if an instruction given to the jury is deemed erroneous, this court will overturn a jury verdict and grant a new trial based on an erroneous jury instruction "only if it rises to the level of prejudicial error." *CSX Transp., Inc. v. Pitts*, 430 Md. 431, 458 (2013). To be prejudicial, an erroneous instruction must be "misleading or distracting for the jury" or permit the jury to "speculate about inapplicable legal principles." *Barksdale v. Wilkowsky*, 419 Md. 649, 669–70 (2011) (citing *Fry v. Carter*, 375 Md. 341, 335 (2003)). There are no "[p]recise standards for the degree of prejudice required for reversal," *Beahm v. Shortall*, 279 Md. 321, 331 (1977). Nevertheless, to evaluate how prejudicial an erroneous instruction might have been, a reviewing court may consider, among other things, (1) how the appellee's argument to the jury "may have contributed to the instruction's misleading effect," (2) whether the jury asked for a rereading of the erroneous instruction and (3) the effect of other instructions in remedying the error. *Barksdale*, 419 Md. at 669 (quoting *Nat'l Med.*

*Transp. Network v. Deloitte & Touche*, 72 Cal. Rptr. 2d 720, 731 (1998)) (internal quotation marks removed).

The reviewing court focuses its inquiry "on the probability, not the possibility of prejudice." *Flores v. Bell*, 398 Md. 27, 33 (2007). But definitive proof of prejudice is not required. "The mere uncertainty as to prejudice may be grounds for holding an error is reversible." *Barksdale*, 419 Md. at 667 (citing *Flores*, 398 Md. at 35, and Roger J. Traynor, *The Riddle of Harmless Error* 64 (1970) (observing that an error "can be declared prejudicial for the simple reason that the court is unable to declare a belief one way or the other as to the probable effect of the error on a particular judgment.")). This approach is especially apt in cases in which the form of the jury's verdict makes it difficult—if not impossible—for a reviewing court to decide whether the erroneous instruction was relied upon in reaching that verdict. *See Fry*, 375 Md. at 356. This is because "a court cannot 'unbake' the jury verdict and examine the impact of any one ingredient." *Barksdale*, 419 Md. at 665.

The Court's analysis in *Barksdale* is instructive as we assess the prejudicial effect of the instructions in the present case. In *Barksdale*, the plaintiff sued the owners of her childhood home, claiming she had been injured by lead paint on the premises. The Court of Appeals held an instruction given at trial, on a tenant's duty to keep a dwelling "clean and sanitary," was erroneous because it "was not relevant to the issues before the jury, i.e., whether the landlord was negligent or engaged in deceptive trade practices in renting the Property." *Id.* at 655–56. The instruction was prejudicial because it suggested that the plaintiff's grandmother, who rented the home from the defendant, may have been

contributorily negligent for failing to report flaking paint to her landlord. Whether the grandmother had been negligent was not an issue before the jury, however, because the grandmother's failure to report the flaking paint could not be attributed to the child, who was also too young to have had any duty to report at that time. The error "touched on the heart of the case," by inappropriately apportioning blame for Barksdale's injury, and thus warranted a reversal of the judgment for the defendants. *Id.* at 672.

Among the authorities relied upon by the *Barksdale* Court was a Minnesota case that, like this appeal, dealt with conflicting standards of care given in jury instructions. In *Lindstrom v. Yellow Taxi Co. of Minneapolis*, 214 N.W.2d 672 (1974), a suit for damages brought by injured passengers in a taxi cab, the trial court gave jury instructions that combined an inapplicable general negligence "reasonable care" standard with the correct "highest degree of care" standard applied to Minnesota common carriers, like the defendant taxi company. *Id.* at 674. Even though the trial court later withdrew its instructions on the "reasonably-prudent-person standard of care," it ended up granting the plaintiffs' motion for a new trial. *Id.* The Minnesota Supreme Court affirmed that grant because "repeated references" to the ordinary-care standard, in the court's words, "permeated" the jury's charge and "failed to convey clearly to the jury the single standard of care applicable to a common carrier." *Id.* at 677.

Application of this case law leads us to conclude that the erroneous instructions in the present case were prejudicial. The general negligence instructions struck at the heart of the case, *viz.,* Dr. Davis's liability, and permitted speculation about inapplicable legal principles (the hypothetical conduct of a reasonable person in the face of foreseeable

harm). The concept of reasonable care as decided by ordinary people, "permeated" the charge given to the jury and left the jurors with two distinct standards against which Dr. Davis's conduct was to be measured: that of a "reasonable person" and that of a "reasonably competent health care provider engaged in a similar practice and acting in similar circumstances." Jurors were also asked to consider whether Dr. Davis had failed to consider some set of risks or to adapt his behavior to them—an issue, like contributory negligence in *Barksdale,* that was not raised by the evidence at trial. The misleading effect of the instruction was compounded by comments in Mr. Armacost's closing arguments inviting the jurors to disregard the expert testimony needed to establish the appropriate standard of care.[11]

Our concerns about juror speculation beyond the bounds permitted by the proper standard of care for health care professionals were not allayed by the following exchange between this Court and appellee's counsel at oral argument (emphasis added):

| The Court: | If the medical health care provider instruction encompasses a duty to consider the patient's preexisting health condition as part of the standard of care and skill, then how [is] the 19:3 instruction . . . pertinent to what the jury is supposed to do? What legal principle does it add to the . . . standard instruction for a medical malpractice case? |
| Appellee: | [I]t helps the jury to understand this idea of what is reasonable care. It is an additional piece of information for jurors who don't |

---

[11] To be sure, jurors in a medical malpractice case are free to weigh the credibility of expert testimony. But a plaintiff cannot recover if the experts' testimony is ignored entirely. It is from this testimony that the applicable standard of care is to be gleaned. *See Puppolo v. Adventist Healthcare, Inc.*, 215 Md. App. 517, 534 (2013) (trial court properly granted summary judgment in medical malpractice case because plaintiff failed to identify an expert to establish the standard of care).

> in their everyday lives think about what is reasonable care and what is reasonable care under the circumstances.

The Court: *[A]re you saying that it allows them to make an assessment about reasonableness outside of what the experts have testified to?*

Appellee: It allows them to make an assessment of reasonableness based on the evidence, which is what we asked them to do.

The Court: [A]nswer my question.

Appellee: *The answer to your question is yes* because that's what we ask them to do.

Additionally, while the erroneous instruction was not reread for the jury, a printed version of the erroneous instruction accompanied the jury during its deliberations. And the other instructions given, orally and in print, did not remedy the error. The trial judge gave the proper standard of care only once. In total, the "reasonably competent health care provider" was mentioned one time in the instructions, while the "reasonable person" was named four times.

We are further inclined to find the error prejudicial because, although the jury completed a verdict sheet, the questions therein do not permit us to rule out the probable prejudice of the error. The questions on the verdict sheet and the jury's yes-or-no answers to them tell us that Dr. Davis was found negligent but do not evince the standard of care upon which that verdict was based. As it was for the Court in *Barksdale,* it is impossible for us to divine the extent to which the erroneous instruction affected the jury's deliberations.

The law is clear that the jury was supposed to evaluate Dr. Davis against his peers. But the erroneous instructions from the trial judge and the invitation from plaintiff's

counsel to disregard the opinions of the experts permitted a jury not made up of neurosurgeons to impermissibly speculate about how they would have approached the risks attendant in a four-level anterior cervical discectomy and fusion surgery. The instructions also implied that Dr. Davis's failure to adapt his course of treatment to an increasing danger was at issue when no such evidence was put before the trier of fact. For those reasons, we conclude that the challenged instructions were both erroneous and prejudicial.

## II. The supplemental jury instruction

The second part of Dr. Davis's appeal focuses on the timing and the wording of the modified *Allen* charge given by the trial judge, as well as the court's preface to the instruction. As noted above, the jury began to deliberate during the afternoon of May 23. Deliberation continued for all of May 24, until the jury sent a note to the court: "Undecided. Please recess until tomorrow." The jury resumed deliberations on the next morning, and, at around 2:15 p.m., the jury sent the court another note that read, "Please advise as to what happens if we are unable to reach a unanimous decision."

At this point, the trial court conferred with counsel about how to respond to the jury's question (emphasis added):

| | |
|---|---|
| The Court: | I propose to have them come out and read the Allen charge. *I'm going to let them know—I mean, today, if they can reach a decision today I think that's it, but we will give them another hour and see if anybody wants to re-examine his or her evidence.* |
| [Defendant's Counsel]: | May I be heard briefly? |

| | |
|---|---|
| The Court: | Yes. |
| [Defendant's Counsel]: | I know that the Allen charge is relatively widely recognized but I would object to it being given. |
| | I think it unfairly indicates to people that they should sway their views and perhaps give up a position that they hold very firmly. |

* * *

| | |
|---|---|
| | I would ask that the jury be given to the end of the day without it. And if they can't, at that point in time I would move for a mistrial. |
| The Court: | Not responding to this note for two hours? Just let them sit in there, and stew, that's your proposal? |
| [Defendant's Counsel]: | Oh, no, Your Honor. I would bring them out and say we would ask that you continue your . . . deliberations and attempt to reach a unanimous conclusion. |
| The Court: | All right. I feel as though they have already done that. They told us yesterday undecided, and so they said that yesterday and we just let them go home. So we already gave them that chance. |

The court recalled the jury to the courtroom and told the jurors that a mistrial would be declared if they were unable to reach a unanimous decision; it would then be up to the parties to decide whether or not to retry the case. The judge then gave the following instruction (emphasis added):

> [Y]our verdict must represent the considered judgment of each juror. To return a verdict it is necessary that each juror agree. Your verdict must be unanimous. Do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict.

> It is your duty as jurors to consult with one another, and we know that you have been doing that since you began your deliberations. It is your duty to deliberate with a view to reaching an agreement if you can do so without violence to individual judgment.

19

Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors.

In the course of your deliberations, do not hesitate to re-examine your own views and change your opinion if you are convinced it is erroneous.

So *I'm going to ask you to deliberate another hour*. I know that you have been at it pretty hard. We have been in the courtroom and have heard you from time to time. We can't hear what you say. We just hear words being said. . . . And *we will see if you can reach a verdict today*. . . .

*I'm not going to ask you to return tomorrow*, but I do want you to try again.

The jury was sent back to deliberate and, at the end of the hour, returned a verdict for for Mr. Armacost on the malpractice issue only.

Dr. Davis raises three arguments with respect to the court's supplemental jury instructions. He first argues that the court abused its discretion in telling the jurors a mistrial would result from a failure to reach a unanimous decision. He also claims it was an abuse of discretion to give the modified *Allen* charge at all because it was not established that the jury was deadlocked. Finally, he challenges the court's addition to the approved language of the modified *Allen* charge, providing an apparent one-hour deadline to reach a verdict, which, he claims, unduly coerced the jury.

Mr. Armacost responds that the trial court acted within its broad discretion in answering the jury's question about a failure to reach a unanimous decision and in deciding to issue the modified *Allen* charge on the third day of deliberations, after the jury had sent two notes indicating its inability to reach a unanimous decision. He also contends that the judge's asking jurors to deliberate for one more hour and telling them they would not be brought back the following day did not actually impose a deadline for a verdict.

We agree with Mr. Armacost on the first two points. But the third issue—the court's apparent one-hour deadline to reach a verdict—is more problematic.

## A. The standard of review

A trial court's decision to give supplemental jury instructions—including, among other things, a modified *Allen* charge—is within the sound discretion of the trial judge and is subject to review by the Court for an abuse of discretion. *See State v. Bircher*, 446 Md. 458, 462 (2016) (providing the standard of review for jury instructions generally); *Nash v. State*, 439 Md. 53, 90 (2014) (citing *Kelly v. State*, 270 Md. 139, 144 (1973)) (providing the standard of review for modified *Allen* charges specifically). Supplemental instructions may include "an instruction given in response to a jury question." *Appraicio v. State*, 431 Md. 42, 51 (2013).

## B. To inform the jury of the possibility of a mistrial was not an abuse of discretion.

Dr. Davis argues that the court erred by disclosing, in response to a question from the jury, that the inability to reach a unanimous decision would lead to a mistrial. We are not convinced by this argument. Trial courts, in fact, "have a duty to answer, as directly as possible, the questions posed by jurors." *Appraicio,* 431 Md. at 53. The trial court's clarifying instruction should not be "ambiguous, misleading, or confusing." *Id.* at 51 (quoting *Battle v. State*, 287 Md. 675, 685 (1980) (internal quotation marks removed). And the judge's response should be more circumscribed when the jury "seeks guidance on how to find the facts." The trial court in this case was not addressing a question about

21

facts or the inferences to be drawn from them, nor was the answer given "ambiguous, misleading, or confusing."

Dr. Davis suggests that the trial court nonetheless erred because this answer was given in conjunction with a modified *Allen* charge. We need not look further than the facts of *Plumley v. State*, 4 Md. App. 671, 680–81 (1968), in which we held that the court did not abuse its discretion by prefacing a modified *Allen* charge by saying the following:

> Well, I have no desire to rush you into anything, but as you know, this case has been going on for four days now and ultimately is going to have to be decided. If it can't be decided by you then another jury is going to have to decide it.

That remark was given by the court *sua sponte*, after seven hours of deliberation and after the jury foreman had reported progress in its decision-making.

In the case before us, the trial court provided the jury with a similar disclosure during the third day of deliberation and in response to a question about this very issue from the jury. The disclosure—that a failure to reach a unanimous decision results in a mistrial—was an accurate statement of Maryland law. As in *Plumley*, we do conclude that the trial court's response was not an abuse of discretion simply because it was followed by a modified *Allen* charge.

**C. The decision to issue a modified *Allen* charge was not itself an abuse of discretion.**

A modified *Allen* charge is an instruction given to juries when the trial judge believes they are deadlocked or, even before deliberations begin, as a general instruction about juror unanimity and a duty to deliberate. *Hall v. State*, 214 Md. App. 208, 218–19 (2013). The charge's name comes from the U.S. Supreme Court decision *Allen v. United States*,

164 U.S. 492, 501 (1896), in which a trial judge, when recalling the jury for further

instructions, told the jurors:

> that in a large proportion of cases absolute certainty could not be expected; that, although the verdict must be the verdict of each individual juror, . . . they should examine the question submitted with candor, and with a proper regard and deference to the opinions of each other; that it was their duty to decide the case if they could conscientiously do so; that they should listen, with a disposition to be convinced, to each other's arguments; that, if much the larger number were for conviction, a dissenting juror should consider whether his doubt was a reasonable one which made no impression upon the minds of so many men, equally honest, equally intelligent with himself.

In Maryland, the traditional *Allen* charge has been supplemented by a modified

version recommended by the American Bar Association. *Burnette v. State*, 280 Md. 88,

96 (1977) (holding the ABA-approved instruction "superior" to the traditional *Allen*

charge because "[i]t does not charge the minority to doubt the reasonableness of its

convictions when they are not concurred in by the majority," avoiding the "coercive

tendency" of the instruction). This preference is also reflected in Maryland's pattern jury

instructions.[12]

---

[12] *See* MPJI-Cv 1:21 "Deadlocked Jury Charge (Allen Charge)" (2017):

> The verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree thereto. Your verdict must be unanimous.

> Do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict.

> It is your duty, as jurors, to consult with one another and to deliberate with a view to reaching an agreement, if you can do so without violence to individual judgment.

> Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your

"[T]he decisions as to whether to utilize an *Allen*-type[13] charge, when to employ it, and what words should be selected are best left to the sound discretion of the trial judge." *Kelly*, 270 Md. at 143 (1973). The charge is normally given, however, "only when the jury appears to have encountered difficulties in reaching unanimity," and especially when the jury has announced those difficulties in some way. *Orthopedic Equip. Co. v. Eutsler*, 276 F.2d 455, 463 (4th Cir. 1960). When jurors "'announce their failure to agree, the court may impress upon them the importance of agreeing, urge them to listen to argument and sacrifice the pride of personal opinion, and he may send them back for further deliberation until such time as it becomes apparent that hope of an agreement is futile.'" *Leupen v. Lackey*, 248 Md. 19, 26 (1967) (quoting 1 *Branson's Instructions to Juries* 149–50 (3rd ed. A. Reid 1960 Replacement)). A jury must be given "ample time for discussion and consideration of the issues," *Kelly*, 270 Md. at 144, but no fixed minimum deliberation is required before a modified *Allen* charge may be given.

In *Plumley v. State*, we approved the use of an *Allen* instruction after a jury had been deliberating for seven hours. 4 Md. App. 671, 683 (1968). There, the trial court recalled the jury to the courtroom to give the charge on its own motion—without any other sign of juror inability to reach an agreement. In fact, the jury, when asked, reported *progress*, not impasse, to the judge. *Id.* at 680. In *Lang v. State*, the jury deliberated less than five hours

---

deliberations, do not hesitate to reexamine your own views and change your opinion if convinced it is erroneous.

[13] The term "*Allen*-type charge" means the same thing as "modified *Allen* charge."

before the charge was given. 6 Md. App. 128, 133 (1969). In neither case was it determined that the judge abused his discretion in issuing a modified *Allen* charge.

Here, the jury was more than halfway through its third day of deliberation, and the jurors had reached out to the judge to ask what would happen if they could not reach a decision, before the charge was given. At that point, the judge's determination that the jury was struggling to reach a unanimous decision was a reasonable one. The trial court did not abuse its discretion in deciding that delivering a modified *Allen* charge might assist the jury.

This conclusion, however, is not the end of our analysis. Notwithstanding the deference that appellate courts give to a trial court's decision as to *whether* and *when* to issue a modified *Allen* charge, if the charge itself was unduly coercive, the instruction ultimately given may warrant reversal of the judgment below.

**D. The judge's time-conscious modifications to the charge were unduly coercive.**

In deciding whether a modified *Allen* charge warrants reversal, "[t]he question to be determined is whether resort to the instruction forced or helped to force an agreement which would not otherwise have been reached except for the intimidating or coercive effect of the charge upon some jurors or whether it merely initiated a new train of real deliberation which ended the disagreement and enabled each juror conscientiously and freely to subscribe to the unanimous verdict." *Fletcher v. State*, 8 Md. App. 153, 155–56 (1969). A deadlocked jury should not be coerced into reaching a verdict when a modified *Allen* charge is given. *Hall v. State*, 214 Md. App. 208, 218 (2013) (citing *Kelly*, 270 Md.

at 144). Juries must instead reach their conclusions "freely and voluntarily, without being swayed or tainted by outside influences." *Caldwell v. State*, 164 Md. App. 612, 635 (2005) (citing *Bishop v. State*, 341 Md. 288, 294 (1996)).

A trial court, in issuing a modified *Allen* charge, "should closely adhere to the wording of the ABA recommended instruction." *Kelly*, 270 Md. at 143. Any deviation from the approved language merits careful review by the appellate court. *Hall*, 214 Md. App. at 220. The judge gets more latitude when modifying a modified *Allen* charge before the jury retires to consider the case. But if the instruction is given later on because of apparent juror deadlock, any judicial modification will be subject to "careful scrutiny" to determine "whether the province of the jury has been invaded and the verdict unduly coerced." *Kelly*, 270 Md. at 144.

In the present case, the judge modified the ABA charge approved in *Burnette v. State*, 280 Md. 88, 96 (1977), by asking the jurors to deliberate for one more hour and telling them they would not be brought back the following day to deliberate if no decision was reached. Dr. Davis argues that these additions unduly coerced the jury. As evidence of the coercion, he points to the fact that the jury, unable to reach a verdict for two and a half days, came to a unanimous decision within an hour after the judge issued the charge.

That a seemingly deadlocked jury reaches a decision quickly after a modified *Allen* charge is given may suggest coercion. *See Lowenfield v. Phelps*, 484 U.S. 231, 232, 108 S. Ct. 546, 548, 98 L. Ed. 2d 568 (1988). But a quick turnaround does not itself prove the charge given to the jury was unduly coercive. *See, generally, United States v. Arney*, 248 F.3d 984, 990 (10th Cir. 2001) (verdict one hour after charge upheld), *United States v.*

26

*Hernandez-Albino*, 177 F.3d 33, 39 (1st Cir. 1999) (same), *Munroe v. United States*, 424

F.2d 243, 245–46 (10th Cir. 1970) (verdict announced forty minutes after charge upheld)

and *Lang v. State*, 6 Md. App. 128, 133 (1969) (verdict after only seven minutes of

additional deliberation upheld). The point of the charge is to foster the jury's ability to

reach a decision. Depending on the circumstances, that a decision is reached soon after

the charge is given may be no more than a sign of the efficacy of the instruction.

But the modified *Allen* charge was not given in isolation in this case. The trial court

also told the jury it would have one more hour to deliberate and that it would not be

brought back the following day (a Thursday) to continue its deliberations. In doing so, the

trial judge may have, albeit not intentionally, sent the signal to the jury that it was "more

important to be quick than to be thoughtful." *United States v. Flannery*, 451 F.2d 880,

883 (1st Cir. 1971). The clock, and not the reasoned judgment of each individual juror,

was made to control the deliberation.

No Maryland case has confronted a time limit attached to a modified *Allen* charge,[14]

but courts in other jurisdictions have roundly rejected the imposition of such limits,

finding them unduly coercive. *See, e.g., United States v. Amaya*, 509 F.2d 8, 9 (5th Cir.

1975), *cert. denied*, 429 U.S. 1101 (1977) (holding judicially imposed time constraints

coerce verdicts and necessitate reversal; in this case, judge asked the jury, after receiving

---

[14] In *Oliver v. State*, 25 Md. App. 647 (1975), the case did involve a modified *Allen*
charge that urged the jury to go back to deliberate for another half-hour to avoid trying
the case again. The judgment in that case was reversed on other grounds (the bailiff gave
legal advice to the foreman of a deadlocked jury), so whether the charge given would
itself be an abuse of the trial judge's discretion was not decided. *Id.* at 655.

a note about juror deadlock, "Please continue to review the evidence again, try to reach a verdict and report back to me in one hour."); *Lucas v. American Mfg. Co.*, 630 F.2d 291, 293 (5th Cir. 1980) (advising jury that due to impending hurricane it must reach verdict within fifteen minutes was coercive). *See also U.S. v. Lansdown*, 460 F.2d 164, 169 n.3 (1972) (holding judge's decision to order a mistrial after 11 hours of deliberations, in a case with close questions of credibility and without consulting jury or counsel, erroneous. "A jury cannot operate under a rigid time deadline.").

Other courts have held that a supplemental instruction that addresses how long the jury will deliberate may not be inappropriate if no deadline to reach a verdict is imposed. For example, *United States v. Coast of Maine Lobster Co., Inc.,* the Court decided it was not coercive for a judge to ask a jury to deliberate one more hour at 11:30 p.m. and then come back the next morning if it had not reached a consensus on all issues. 557 F.2d 905, 911 (1st Cir. 1977) ("The trial judge gave no indication that a verdict must be reached, much less that a verdict be reached within a specified time."). Similarly, the Court of Appeals for the Tenth Circuit held in *Glazerman v. United* States that a trial court may also ask the jury to advise the court if its deliberations would continue for more than an hour so that the judge can send the jury home for the night. 421 F.2d 457, 554 (10th Cir. 1970).

Unlike *Glazerman* and *Coast of Maine Lobster Co.,* the trial court in the present case told the jury it would *not* be brought back the next day to deliberate if it could not reach a

verdict within an hour.[15] Knowing that failing to reach a decision within an hour could result in a mistrial surely could have pressured the jury to reach some kind of accord under the judge's imposed time limit. The court was not simply asking the jury to reason together; instead, the jurors were entreated "to strive toward a verdict by a certain time." *Burroughs v. United States*, 365 F.2d 431, 434 (10th Cir. 1966) (A modified *Allen* charge was unduly coercive when judge twice asked jury to try to reach a decision within an hour.).

We believe that, like the instructions in *Burroughs*, the trial court's modified *Allen* charge, coupled with an apparent one-hour deadline, had the effect—whether or not intended—of suggesting to the jury that the court was "anxious to conclude the lawsuit, and we think it entirely reasonable to infer that the jury was aware of [this] anxiety." *Id.* The *Burroughs* Court observed that "verdict-urging on the part of the court tends to undermine the proper function of the common law jury system as contemplated by the Seventh Amendment. We must guard against any such subtle inroads." *Id.*

The right to a jury trial in a civil action in a Maryland court is not guaranteed by the Seventh Amendment, but rather by Articles 5 and 23 of the Maryland Declaration of

---

[15] Mr. Armacost asserts that the judge may have intended to bring the jury back at another point to resume deliberations. But no such indication was given to the jury. Moreover, the instruction was given on a Wednesday and the court was open on the following day. It was reasonable for jurors to infer that the additional hour for deliberation granted by the judge would be the last opportunity to reach a verdict before the trial had to be repeated with another jury.

Rights. Even though the source of constitutional protection is different, the dangers posed by the "verdict urging" at issue in *Burroughs* loom equally large for us.

## Conclusion

We hold that the trial court erred in giving general negligence instructions, framed in terms of the conduct of a reasonable person, in a medical malpractice case. Those concepts invite jurors to substitute their judgment for that of a neurosurgeon.

Additionally, we conclude that the court did not err in informing the jury that a mistrial would result from a failure to reach a unanimous decision and that, under the circumstances of this case, the court also did not abuse its discretion by giving a modified *Allen* charge. However, the court did err by giving that instruction while at the same time imposing a time limit of one hour for further deliberation. The time limit rendered the supplemental instruction unduly coercive.

Each error is prejudicial and each requires reversal.

**THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY IS REVERSED AND THIS CASE IS REMANDED FOR PROCEEDINGS CONSISTENT WITH THIS OPINION. APPELLEE TO PAY COSTS.**